In re KYTE.

(District Court, M. D. Pennsylvania. December 24, 1909.)

No. 1,035, in Bankruptcy.

1. BANKRUPTCY (§ 408*)—DISCHARGE—OBJECTIONS—FRAUDULENT CONCEALMENT OF PROPERTY.

Where a bankrupt's trustee had possession of his check stubs, and it appeared that the bankrupt, after having had his book made up at the bank, first turned over the checks to the receiver, and, after making up his schedules, delivered them to the trustee's son, which placed them at the command of creditors, he was not guilty of fraudulent concealment of property, consisting of the withholding of his bank checks.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 408.*]

2. BANKRUPTCY (§ 408*)—DISCHARGE—OBJECTIONS—CONCEALMENT OF PROPERTY.

Where a bankrupt received $110 for goods sold after bankruptcy proceedings had been instituted, but he did not know of the proceedings at the time, and he entered the sale on his cashbook, he was not guilty of fraudulent concealment of the proceeds thereof, though the money could not be traced thereafter.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 408.*]

3. BANKRUPTCY (§ 408*)—DISCHARGE—FRAUDULENT OMISSION OF ASSETS FROM SCHEDULES—ADVICE OF COUNSEL—INSURANCE POLICY.

Where a bankrupt had borrowed the full surrender value on his life insurance and had been advised by counsel that it was not necessary to mention the policies in his schedules, whereupon he gave them to his wife, he was not guilty of fraudulent concealment of assets on the theory that the policies were of no value, though they should have been scheduled; the charge of fraud being rebutted by the advice of counsel.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 408.*]

In re Remmers (C. C. A.) 173 Fed. 484, 23 Am. Bankr. Rep. 78. The advice of counsel cannot be relied on as an excuse for failing to schedule assets, unless there has been a full disclosure of the facts by the bankrupt at the time.

4. BANKRUPTCY (§ 407*) — DISCHARGE — OBJECTIONS — FALSE STATEMENT FOR COMMERCIAL CREDIT.

Where a bankrupt began business in April, 1906, and was put into bankruptcy in September, 1907, and on October 2, 1906, made a false statement to a commercial agency in order to prevent "unfavorable reports" being given out concerning him, and later attempted to correct such statement by another, which was also false, and he referred to the same and was granted credit on the basis thereof, he was guilty of willfully making a false statement for credit, which was sufficient to deprive him of the right to discharge.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 407.*]

5. BANKRUPTCY (§ 407*)—CREDIT STATEMENTS.

A financial statement, made by a bankrupt for credit, to a commercial agency, is a continuing representation for a reasonable time that the facts stated therein are true.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 407.*]

6. BANKRUPTCY (§ 407*)—GROUNDS FOR REFUSAL OF DISCHARGE—"FALSE" REPRESENTATIONS IN OBTAINING CREDIT.

In order to be "false" so as to bar a discharge, the representations made by a bankrupt to obtain credit must have been willfully or intentionally misleading.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 407.*

For other definitions, see Words and Phrases, vol. 3, pp. 2654, 2655.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Bankruptcy. In the matter of Frank H. Kyte, bankrupt. On exception to the report of referee sustaining objections to the bankrupt's discharge. Affirmed.

See, also, 158 Fed. 121; 164 Fed. 302.

James L. Lenahan and W. I. Hibbs, for bankrupt.
F. C. Mosier, for creditors.
W. N. Reynolds, Jr., for the trustee.

ARCHBALD, District Judge. The bankrupt's discharge is opposed because of alleged fraudulent concealment and transfer of property, as well as the making of a false statement of his financial condition for the purpose of obtaining commercial credit. Particular instances are specified in the objections, a part of which only are sustained by the referee, but enough, in his judgment, to call for the refusal of a discharge, and the question is as to the correctness of his conclusions.

There is nothing in the alleged withholding by the bankrupt of his bank checks, which has any approach to a fraudulent concealment of property. Not only did the trustee have possession of the stubs, which does away with the possibility of concealing what they were given for, but the evidence further shows that, after having his book made up at the bank, the bankrupt first turned over the checks to the receiver, and having got them again, when he made up his schedules, delivered them, after he was through, to the trustee's son, which fully disposed of them, so far as he was concerned, and put them at the command of creditors.

So, also, as to the $110 received from File, to whom he had sold quite a lot of goods after bankruptcy proceedings had been instituted, the evidence is that he did not know of the proceedings at the time, and, although the price at which he disposed of them and the circumstances attending it are calculated to excite suspicion, the only charge here is that he did not account for the money received, and so was guilty of concealing it, and this is sufficiently met by the fact that he entered the sale on his cashbook, which may be accepted as dispelling the idea that he had any intention of covering up the transaction, even though we may not be able to trace the money after that.

With regard to the life insurance policies, which were omitted from the schedules, it is explained that they were pledged to the companies for loans to their full surrender value, and that the bankrupt was advised by counsel that it was not necessary to mention them in view of that, the gift of them by the bankrupt to his wife, under the circumstances, also parting with nothing of value. Unquestionably these policies ought to have been scheduled; and the failure to do so, accompanied by the gift of them to the bankrupt's wife, naturally aroused suspicion, if it did not indeed go further than that. But the advice of counsel rebuts the charge of fraud in omitting them from the schedules. In re Alleman (D. C.) 20 Am. Bankr. Rep. 745, 162 Fed. 693. And that for the present is all that we are concerned with. There are other objections, however, to the bankrupt's discharge of a more serious character, which are not so easily disposed of.

The bankrupt in April, 1906, began business under the name of the Pittston Mercantile Company, and was put into bankruptcy in Sep-

tember, 1907, a year and a half later. On October 2, 1906, he made the following unsolicited statement in writing to the R. G. Dun & Co. Mercantile Agency.

"Pittston, Pa., Oct. 2, 1906.

Dun Agency, Wilkes-Barre, Pa.—Dear Sir: We are occasionally informed of the unfavorable reports received from you in reference to us, and accordingly think it wise for us to make you a statement, as things have changed somewhat since the writer went in business. The writer would state as follows:

I am the owner of real estate in W. Pittston, valued at .......... 3000.
I own one half the Bridge property W. "       "       " .......... 7000.
"      "   eight shares in Union Saving Trust Co., this city...value, 1200.
"      "   stock in People's Bank of Erie, Pa.................. "   2250.
"      "   bonds " Kewanee Tel. Co., Kewanee, Ill............ "   2000.
"      "   stock "    "       "      "       "       " ............ "   1000.
Mortgage against property in Dorranceton................. "   2500.
8000 shares in Umpqua Coal Co., Umpqua, Oregon.......... "   4000.
Own real estate on Broad St., this city.................... "   6000.
Have a stock of Builders hardware......................... "   3000.

"I have mortgaged my own property for $2,000. thus risking my own money and increasing my business capital. I also have a mortgage of $3,000 on Broad St. property, and have a cash capital of $7,000. We have started to erect a building on Broad St. property, in order to have more suitable quarters for our increasing business. We started in business about the first of April, and have turned a business of over $14,000 since that date.

"Yours truly,          [Signed]   Pittston Mercantile Company,
                                       "F. H. Kyte, Treas."

This statement in several particulars was untrue and misleading, and must have been known by the bankrupt to have been so. Eight thousand shares of Umpqua Coal Company stock, for instance, which is put in at $4,000, was purchased at from six to eight cents a share, making not to exceed $320, and a few months later, in March, 1907, without any suggestion that it had depreciated in the meantime, or that anything had occurred to change his estimate of it, he gave the stock to his wife; his explanation being that it was of no value.

The same is true with regard to the Kewanee Telephone stock, valued at $1,000, which was obtained by the bankrupt as a bonus, at the time of taking $2,000 of bonds of the company, and was also turned over as a gift to his wife in April or May, 1907, about the same time as the coal stock. There is no direct evidence as to the value of the stock, but the probabilities against it are so great as to warrant the inference that it had none; this indeed being the only thing to justify the transfer to his wife, which was without consideration, and while involved in commercial obligations.

The bonds of the Kewanee Telephone Company, to which the stock was a bonus, put in at $2,000, were no doubt worth that; but they were held at the time by the First National Bank of Pittston, as collateral security for a loan of $2,300, and were thus pledged to their full value, which the bankrupt was bound to disclose, in order to convey a correct idea of his financial condition.

The mortgage against the property in Dorranceton, which is listed at $2,500, is also given a misleading value, if indeed it is entitled to any place at all in the statement. This was a second mortgage, subject to a first mortgage of $3,000, it being a question whether the prop-

erty was good for the aggregate, and was executed by Walter H. Kyte, a son, to his father, the bankrupt, to secure him for the loan of certain stock held by the bankrupt as collateral security to the note of one C. M. Hileman for $2,000. The son, as it seems, was allowed to take this collateral and obtain a loan on it, and gave his father a mortgage to protect him. The Hileman note, to which the stock so borrowed and used was collateral, was, of course, an asset, if owned by the bankrupt, although it turned up in the end, in the hands of his wife, like so much of his other property; and it was good for its face, if the maker was solvent and the collateral available. But only by the extremest courtesy, under the involved conditions with regard to it, could the mortgage in question be similarly accepted. If the stock turned over by the bankrupt to his son was not forthcoming when required, the mortgage could be enforced, and, subject to the first mortgage, the property could be made to respond for it; the Hileman note in the meantime being uncollectible until the collateral had been accounted for. .It may be that a solution could be worked out in this way, by which the bankrupt would get out of Hileman the $2,000 called for by his note, although if the collateral went to pay the son's loan, and happened to be of any considerable value above that, the bankrupt, instead of getting anything from Hileman, might be liable to him for the difference. If Mrs. Kyte is to be believed, however, the Hileman note was given to her in May, 1906, "as a free will offering," and, if so, it was not owned by the bankrupt in October when he made his statement, and there would be nothing therefore coming to him out of the transaction. He still claimed it on May 17, 1906, in his letter to the Stewart Iron Works; but it was ultimately paid to his wife, after his bankruptcy, and she is therefore probably correct with regard to it. At all events, the mortgage which was put in at $2,500 in the statement, being at best a mere indemnity of the bankrupt against loss by reason of the loan of the collateral which he had parted with, had no place among his available assets.

The statement, as made, is thus shown to have been untrue, and the purpose of it being to secure commercial credit, if it was intentionally so, and property was in fact obtained on the strength of it, a case is made out within the terms of the statute, and the bankrupt cannot expect a discharge in the face of it. It is of no consequence, in this connection, that the statement was made to Dun & Co. and not to a creditor. The object of the bankrupt was to secure a favorable rating in the reports of the commercial agency, and in that way to reach its subscribers and customers. This he very well understood and acted upon, as is shown by his letters to various parties. And in so doing it was the same in fact, as in legal effect, as if he had made the statement direct to the parties who relied on it. Tindle v. Birkett, 171 N. Y. 520, 64 N. E. 210, 89 Am. St. Rep. 822; Irish American Bank v. Ludlum, 49 Minn. 344, 51 N. W. 1046; Ralph v. FonDersmith, 10 Pa. Super. Ct. 481; In re Carton & Co. (D. C.) 17 Am. Bankr. Rep. 343, 148 Fed. 63. He sent it in to Dun & Co., as the opening sentence shows, to obviate unfavorable reports with regard to his financial standing, which had previously emanated from this agency, and thus took upon himself the consequences.

On January 31, 1907, the bankrupt ordered a bill of goods, amounting to $301.40, of J. Wiss Sons & Co., of Newark, N. J. These parties seem to have had some doubts about filling the order, and on March 15 the bankrupt sent a second letter, urging that the goods should be forwarded. In the meantime Wiss & Co. had requested the Dun Agency to report on the bankrupt, and a copy of the statement which he had made was accordingly forwarded to them, accompanied, however, by the suggestion that some of the values were high, and that $18,000 was probably a fair estimate of his net worth, instead of $27,000, as he himself figured it. And on the strength of this the goods were sent. It is very likely that these were not the only ones which were got in this way. But it is certain that they were. And a case is thus made out of property obtained on the strength of a false statement, within the meaning of the statute, provided, of course, that it was intentionally so. It is true that the estimates of the bankrupt were revised and cut down by Dun & Co., and considerably more eliminated than has here been shown necessary. But there are no means of identifying the items as to which this reduction was made, and it is none the less true, without regard to it, that the goods in question were obtained by the bankrupt on the credit secured by the exaggerated estimate of his assets, which was not only copied in the Dun & Co. report, but, however modified, necessarily entered into it and affected it. Neither is it requisite, in order to make out the false pretense charged, that the bankrupt's statement should have been the sole inducing cause in obtaining the goods. 19 Cyc. 407. Nor does it matter that an independent investigation to a certain extent was made with regard to it. People v. Luttermoser, 122 Mich. 562, 81 N. W. 565. It is enough if the representations of the bankrupt had a material influence in securing goods, and that the creditors in question would not have made the sale except for them.

To bar a discharge, however, a credit statement must not only be untrue, but it must be false. Section 14b (3) (Act July 1, 1898, c. 541, 30 Stat. 550 [U. S. Comp. St. 1901, p. 3427], as amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 [U. S. Comp. St. Supp. 1909, p. 1310]). And that means that it must be willfully or intentionally misleading. The bankrupt, in other words, must have knowingly misrepresented his condition. Gilpin v. National Bank, 21 Am. Bankr. Rep. 429, 165 Fed. 607, 91 C. C. A. 445, 20 L. R. A. (N. S.) 1023. He must not simply have been self-deceived or mistaken. To rebut any such charge in the present instance, evidence has been given that the bankrupt on October 12, 1906, 10 days after making his first statement, sent in another to Dun & Co., in which, in correction of the other, he claimed, as available assets, book accounts of $4,000, and cash on hand $1,050; and at the same time specified further indebtedness of $10,500, to wit, $4,500 of bank paper, and $6,000 of judgment notes, not recorded. He also stated that the estimate put on the telephone stock should merely be taken as its par value, and that the Dorranceton mortgage was a collateral one. If anything was wanting to prove the misleading character of the former statement, it is to be found in this one. While $5,050 of alleged assets ($4,000 of which, it is to be noted, are book accounts, always uncertain) may have been

added on the one side, $10,500 of indebtedness, not in any way previously suggested, appears on the other, making the net result over $5,000 to the disadvantage of the bankrupt; while the Kewanee Telephone stock put in at a $1,000, and the Dorranceton mortgage at $2,500, are practically discredited, thus still further reducing the value of his property. These corrections the bankrupt claims to have sent by mail to F. H. Stevens, who had charge of the local office of Dun & Co. at Wilkes-Barre, Pa., a few miles from where the bankrupt was in business, and he seeks to vouch for this by producing an alleged carbon copy, which his son testifies he made at the time of typewriting the original. According to Mr. Stevens, however, this paper was never received; and, if it had been, it undoubtedly would have been entered upon his records. The letter also speaks of a conversation had with Mr. Stevens, a few days before, which it was intended to confirm, of which Mr. Stevens has no recollection. Taken altogether, the story of the bankrupt with regard to the corrected statement is far from convincing. Assuming, however, that it is true, and that the statement was in fact sent, it only partly relieved the situation. There was no correction in it, for instance, of the misrepresentation as to the value of the Umpqua Coal Company stock, or the Kewanee Telephone Company bonds; nor was there any explanation as to the real condition of the Dorranceton mortgage. The statement, in other words, while not so bad as before, is nearly so. At the same time, if actually and in fairness made, it would go a good ways to dispel the idea of a fraudulent purpose in the original. Unfortunately, however, for the bankrupt, there are other things which dissipate the effect of it. The statement to Dun & Co., both in its original as well as its corrected form, was a continuing one. In re Terens (D. C.) 172 Fed. 938. And, unless recalled, was entitled, for a reasonable time at least, to be taken and relied on. The bankrupt understood this, and on January 19, 1907, in an interview with a representative of Dun & Co., he stated that there was no change in his affairs, except that he was starting a wholesale plumbing business in connection with his other lines, and had already put a stock of several thousand dollars in the building which he was erecting, which would be completed shortly. As late as February 21, also, while the Wiss & Co. order was still pending, in a letter to Kellogg & Miller, of Amsterdam, N. Y., to whom he also had sent an order, he referred to his rating with Dun and Bradstreet, as a basis for the credit which he asked.

Now, it is just about this time, notwithstanding his outstanding statement, that he began to turn over to his wife property, some of which at least figures in it. In March, 1907, for instance, the Umpqua Coal Company stock, which was put in at $4,000, was so disposed of. The transfer on the books of the company was not made until September, 1908, a year and a half later; but the testimony is that it was given to her at the time mentioned. So on May 6, 1907, the Kewanee Telephone stock was similarly turned over to her; both of these transactions being without consideration. The explanation of the bankrupt, the same as with regard to his life insurance policies, which went the same way, is that the securities were worthless. But that is not the way they were listed in his statement. And if they were, what is to

be said of the fact that, at the time they were being so disposed of by the bankrupt to his wife upon that basis, they were being held out, and he was getting credit for them, as worth thousands of dollars, which they were not?

Contrasting the one position with the other, it is difficult to resist the conclusion that, in representing these stocks as of large value for the purpose of obtaining goods from prospective creditors, as he did, and in subsequently making a gift of them to his wife as having none, he adapted himself in each instance to the necessities of the occasion, in reckless disregard of the consequences, to an extent which may well be characterized as fraudulent. Nor, in any event, can he escape the fact that, at the time he was asking and obtaining credit on merchandise account from various parties, on the strength of his statement, he had withdrawn and given to his wife securities of the asserted value of $5,000, and that to allow the statement to go uncorrected in the face of this was equally culpable. It matters little, therefore, which alternative is taken. Either the securities were not, as now testified, of the value given them, making the discrepancies in the statement so wide of the mark as to warrant the belief that it was knowingly and intentionally misleading; or, if they were of the value assigned to them, the transfer by the bankrupt to his wife, without consideration, was not only itself a fraud, but it made the statement without a corresponding correction absolutely untrue, as he could not but know, and therefore must be held to have acquiesced in.

The referee further found that the transfer of the insurance policies by the bankrupt to his wife in July, after he had become so involved that he had to ask an extension from his creditors, was also fraudulent, which would itself be effective to bar a discharge; his bankruptcy having occurred within four months afterwards. But, without stopping over that, there is enough in what has been already discussed to produce the same result, and it may be allowed to rest there.

The objections, to the extent indicated, are therefore overruled, and the report of the referee confirmed, and a discharge will be refused in consequence.