In re Thomas L. HOLLISTER, d/b/a Town & Country Cycle World, Inc., and Metro Motorcycle Parts & Accessories, Inc., Debtor.

Don MIRACLE, Plaintiff,

v.

Thomas L. HOLLISTER, Defendant.

Bankruptcy No. 480–00103.
Adv. No. 480–0049.

United States Bankruptcy Court,
N. D. Texas,
Fort Worth Division.

July 31, 1981.

David R. Casey, Hurst, Tex., for Miracle, plaintiff.

Robert W. Caston, Hurst, Tex., for Hollister, defendant.

## MEMORANDUM OPINION

JOHN FLOWERS, Bankruptcy Judge.

Plaintiff, Don Miracle, brings this action seeking to except from discharge an obligation owing by the Debtor, Thomas Hollister. Plaintiff's pleadings and the agreed pretrial order set forth the statutory basis for the requested relief to be 11 U.S.C. § 523(a)(2)(A), which excepts from discharge "a debt for obtaining money, property, services, or an extension, renewal, or refinance of credit by false pretenses, a false representation, or actual fraud."

## FINDINGS OF FACT

Miracle was a former owner of Town & Country Cycle World, Inc. (hereinafter, the "corporation"). On May 17, 1978 Miracle and C. L. Hutchinson sold all of the shares of stock in the corporation to Hollister and Donald Taylor. In consideration Hollister and Taylor executed a promissory note for $145,000.00 and granted the sellers a lien upon the stock to secure payment of the note. The sellers at the request of Hollister agreed to take a lien solely upon the stock certificates rather than the inventory and equipment of the corporation because Hollister believed he would otherwise have to obtain a release each time he wished to sell an item of inventory.

Among the terms contained in the stock purchase agreement are the following:

"Purchaser contracts and agrees that the inventory of the Corporation will never be depleted to the extent that its value is less than the unpaid balance of the note. Breach of this provision shall give Sellers the right to accelerate the payment of the note and to foreclose by the terms of the Security Agreement. In this connection, Seller shall have the right to inspect the inventory on a routine basis."

"Seller represents and warrants to the Purchaser as follows:"

Thereafter follows five pages of representations generally relating to the present financial status of the corporation.

The agreement then provides:

"All statements of fact contained in any memorandum, certificate instrument, or other document delivered by or on behalf of the Seller for information or reliance pursuant to this Agreement shall be deemed representations and warranties by the Seller under this Agreement. All representations and warranties of the parties shall survive the closing and all inspections, examinations or audits on behalf of the parties, and shall expire five years following the closing date."

I find that Hollister at the time the agreement was made had the present intent to fully perform the agreement. On May 17, 1978 the inventory of the corporation was worth $135,000.00. After ownership of the corporate stock was transferred, Taylor became president of the corporation and conducted its day to day operations. Hollister served as secretary-treasurer of the corporation; however, being employed as a full-time pilot with Frontier Airlines was less involved with the corporation's daily transactions. In August of 1979 Taylor resigned his position with the corporation and sold his interest to Hollister.

In March of 1979 Taylor and Hollister mortgaged the inventory of the corporation to Texas Bank of Commerce for an $80,000.00 loan, guaranteed by the Small Business Association. Hollister understood at the time the mortgage was granted that if the corporation defaulted on the bank loan, and the bank foreclosed there would be less inventory available to repay the debt owing to Miracle and Hutchinson. Notice of the mortgage was not given to Miracle until September of 1979.

The testimony at trial reflects that Taylor and Hollister operated the corporation in a negligent manner. Hollister was unable to account for the rapid dissipation of the corporation's assets due in part to a critical failure by the corporation to document its financial transactions. During the initial fifteen months of operation under the management of Hollister and Taylor, the corporation's inventory fell from $135,000.00 to $40,500.00. Hollister purchased a second motorcycle business, Metro Motorcycle Parts, early in 1979. Corporate assets were transferred to the second business by Hollister's employees. Hollister did not learn of these transfers until November of 1979.

The corporation defaulted on the bank loan in September of 1979. The debt and mortgage were assigned to the SBA and the corporate assets were foreclosed upon in December 1979. At auction the entire residual inventory was sold for $11,095.95.

Hollister filed bankruptcy individually and d/b/a Town & Country Cycle World, Inc. and Metro Motorcycle Parts and Accessories, Inc. in March 1980. At the time of the filing Hollister was indebted to Miracle and Hutchinson in the amount of $120,387.00. On June 13, 1980 Miracle filed this adversary proceeding seeking to except Hollister's debt from discharge. June 23, 1980 was fixed as the last day to file a complaint pursuant to 11 U.S.C. § 523(c). Hutchinson has not filed a complaint in this bankruptcy case, consequently any potential non-dischargeable claim is barred by limitations, see 11 U.S.C. § 523(c). Nevertheless Hutchinson assigned his 40% interest in the obligation to Miracle in February 1981 for a consideration of $2,000.00.

### DISCUSSION AND CONCLUSIONS OF LAW

■ Plaintiff alleges that Hollister obtained the corporation's stock and assets on credit by false pretense or false representation or actual fraud in that Hollister agreed that the inventory of the corporation would never be depleted to the extent that the value was less than the unpaid balance owing on the note to the Plaintiff. Plaintiff seeks first to explain the meaning of "depleted" by introducing parol evidence.

The applicable statutory authority on whether parol evidence is admissible is Section 2.202 of the Texas Business and Commerce Code [1] which states in pertinent part:

"Terms ... which are ... set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented ... by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

The May 17, 1978 agreement states:

"The foregoing constitutes the entire agreement and understanding of the parties on the subject hereof and supercedes all prior agreements and understandings relating to the subject matter hereon."

■ I find that the writing evidencing the agreement on May 17, 1978 was intended as a final and exclusive statement of the terms of the agreement, and consequently I will not consider parol evidence of contemporaneous oral agreements of additional terms. However even if a written document has been assented to as the complete and accurate integration of the terms of a contract, it must still be interpreted. Under the parol evidence rule, the standard of interpretation of a written contract is usually the meaning that would be attached to it by a reasonably intelligent person acquainted with all operative usages and

1. Chapter 2 of the Code applies to the sale of goods other than investment securities, § 2.105. Chapter 8 applies to transactions in investment securities, see § 8.102(a) for definition. Chapter 8 contains no parol evidence rule, and where Chapter 8 is silent, Chapter 2 is applicable by analogy, see *Silverman v. Alcoa Plaza* *Associates*, 9 U.C.C.Rep. 429, 37 A.D.2d 166, 323 N.Y.S.2d 39 (1971). Consequently I need not decide whether the transaction between Hollister and Miracle involved "goods" or "investment securities" as the same result is reached.

knowing all the circumstances prior to, and contemporaneous with, the making of the contract other than the oral statements by the parties of what they intended it to mean, *Zell v. American Seating Co.*, 138 F.2d 641 (2nd Cir. 1943).[2]

▉ The issue is the proper interpretation of the phrase "the inventory of the corporation will never be depleted to the extent that its value is less than the unpaid balance of the note." Plaintiff would interpret the term "depleted" to include the term "mortgaged," an interpretation which the Defendant claims adds a totally new dimension to the contract. Appropriate to my discussion is the commentary of one eminent authority:

"The more bizarre and unusual an asserted interpretation is, the more convincing must be the testimony that supports it. At what point the court should cease listening to testimony that white is black and that a dollar is fifty cents is a matter for sound judicial discretion and common sense. Even these things may be true for some purposes. As long as the court is aware that there may be doubt and ambiguity and uncertainty in the meaning and application of agreed language, it will welcome testimony as to antecedent agreements, communications, and other factors that may help to decide the issue. Such testimony does not vary or contradict the written words; it determines that which cannot afterwards be varied or contradicted." *Corbin, The Parol Evidence Rule*, 53 Yale L.J. 603, 622–624 (1944).

I hold that Plaintiff's interpretation of "deplete" to include "mortgage" is within the meaning that would be attached to it by a reasonably intelligent person knowing all the circumstances prior to and contemporaneous with the making of the contract. During the negotiations between the parties, Miracle initially wanted a lien upon the inventory, but withdrew the demand upon Hollister's contention that a release would then be required to sell each item of inventory. The parties then substituted the agreement not to deplete the inventory. This agreement was in substance a crude security device designed to insure that sufficient inventory would be available to pay off the debt in the event of default. It would be unreasonable to interpret the "will not deplete" phrase so as to find Miracle agreed to subordinate his rights to payment from corporate assets at the discretion of Hollister to any other creditors, as would be the case if Hollister had the right to freely mortgage the inventory to other creditors.

Having interpreted "deplete" to encompass the term "mortgage," the critical issue of whether the debtor committed a fraud is reached. Section 523(a)(2)(A) of the Bankruptcy Code does not set forth the elements of fraud. The legislative history reflects that the subsection was intended to codify case law, e. g., *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586 (1887), which interprets "fraud" to mean actual or positive fraud rather than fraud implied in law. I find an appropriate statement of the elements of fraud is that codified in Section 27.01 of the Texas Business and Commerce Code:

(a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

(1) false representation of a past or existing material fact, when the false representation is

(A) made to a person for the purpose of inducing that person to enter into a contract; and

(B) relied on by that person in entering into that contract; or

(2) false promise to do an act, when the false promise is

(A) material;

(B) made with the intention of not fulfilling it;

(C) made to a person for the purpose of inducing that person to enter into a contract; and

---

**2.** In *Zell* the Second Circuit Court of Appeals after discussing the jurisprudential basis of the parol evidence rule chose not to apply it. On appeal, 322 U.S. 709, 64 S.Ct. 1053, 88 L.Ed. 1552 (1944) the Supreme Court reversed with four justices citing the failure of the Circuit Court to follow the state parol evidence rule.

(D) relied on by that person in entering into that contract."

There is no evidence that Hollister on the day of the stock purchase made a false representation of a past or existing fact. I have previously found that Hollister had the present intent to fulfill his contractual obligations when the agreement was made in May of 1978. Plaintiff however contends that the stock purchase contract binds Hollister to renew his promise not to mortgage the inventory each day for the five years following the execution of the contract. In view of the fact that Hollister mortgaged the inventory to the bank in March of 1979, Plaintiff argues that Hollister made his obligatory daily promise not to deplete without the present intent to perform on the day the inventory was mortgaged, and thus committed an actual fraud. In other words Plaintiff asserts Hollister made in the written contract a continuing representation that the value of the inventory exceeds the outstanding debt, and by failing to disclose the dissipation of the inventory Hollister committed a fraud on the Plaintiff.

The leading case in support of the continuing representation theory is *Ginsberg v. International Shoe Co.*, 299 S.W. 695 (Tex. Civ.App.—Dallas 1927) no writ. hist. Ginsberg gave International Shoe a financial statement which represented assets of $20,-347.00 and liabilities of $8,134.00 on April 28, 1925. The Court found that Ginsberg intended the statement to be a representation of financial condition to enable him to obtain credit not only for the goods purchased at that time but also for goods to be purchased in the future. The Court held that International Shoe had a right to rely on the continuing representation of solvency and in fact relied on the representation by subsequently selling goods to Ginsberg while he was insolvent. The Court held that each new order was a positive declaration that the buyer's financial condition was substantially the same as represented in the statement and found Ginsberg committed actual fraud.

■ The *Ginsberg* decision is discussed at 133 ALR 440, 449 along with other decisions in which a continuing representation theory

of fraud is raised. Several decisions, *In re Kyte*, 174 F. 867 (Dist.M.D.Penn.1909) and *In re Terens*, 172 F. 938 (Dist.Ct.E.D.Wis. 1909) recognize that a creditor may rely on a financial statement for a reasonable time. Other decisions place no affirmative duty upon a debtor who initially makes a truthful statement to correct it when his circumstances have changed, see *E. I. DuPont v. Schwenger*, 90 Misc. 678, 154 N.Y.S. 186 (1915). In *J. M. Radford Grocery Co. v. Halper*, 274 S.W. 1023 (Tex.Civ.App.—El Paso, 1925) no writ. hist. the Court although finding the debtor had made a continuing representation as to financial condition held the creditor lost its right to rely on the statement at the time the credit was subsequently extended because the debtor refused to provide more current financial statements. The *Halper* opinion notes: "The law defines the elements of positive fraud and it is not competent for the parties by agreement to change such elements." The *Halper* decision recognizes a fundamental problem when applying fraud to credit agreements. The fraud exceptions to discharge are founded in tort rather than contract. Tort and contract are traditionally distinguished in that the duties in the former are primarily fixed by the law, while in the latter they are fixed by the parties themselves.

■ In *Halper* the creditor asserted that the debtor's continuing representation gave it a continuing right to rely. The court refused to grant the creditor's relief holding that the parties could not contractually redefine the elements of fraud. A creditor must show that it actually relied on a representation, it must prove more than a mere contractual right to rely.

The foregoing fraud cases involve an initial truthful representation of financial condition and subsequent extensions of credit after the financial condition had deteriorated. The case sub judice involves only an initial extension of credit and a subsequent forebearance of foreclosure rights relying on an alleged continuing representation of solvency.

■ I am of the opinion the Plaintiff has not stated a cause of action in tort.

The elements of fraud include a promise made without the present intent to fulfill it. Plaintiff seeks to meet the present intent element of fraud by asserting Hollister contracted to renew his promise each day and that when the contract was subsequently breached the lack of present intent to perform element may be implied.

However if Plaintiff's theory of fraud were followed the discharge in bankruptcy would as a practical matter become an impotent legal right. Credit agreements would as a matter of course contain language to the effect that every day a loan is outstanding the debtor renews its promise to pay the debt. Upon default the creditor could merely cite the continuing promise language as a basis for asserting no present intent to perform on the day of default. A contractual agreement to renew a promise on a day to day basis does not of itself give rise to a tort claim for fraud. To maintain an action in tort the creditor must show the debtor actually renewed the promise each day by means of some overt conduct.

There is another reason for denying plaintiff's requested relief. That is because a fair interpretation of the May 17, 1978 agreement is that it does not contain a continuing day-to-day promise by Hollister to maintain an inventory level in excess of the outstanding debt. The writing evidencing the agreement sets forth that Hollister "*contracts* and *agrees* that the inventory of the Corporation will never be depleted to the extent that its value is less than the unpaid balance of the note." (emphasis added). This language does not purport to represent any existing fact as true but rather is a promise performable in the future. Elsewhere in the writing the seller *represents* and *warrants* . . . certain facts about the corporation. (emphasis added). The writing then provides that "all *representations* and *warranties* of the parties shall survive the closings . . . and shall expire five years following the closing date. (emphasis added). It is Plaintiff's contention that the "survive the closing" clause supplements the meaning of the "will never be depleted" language transforming the promise into one that is reaffirmed each day for five years.

It is significant that the contract contains the words "represents" and "warrant" in the context of statements of existing fact such as, "the Corporation has good, absolute, and marketable title to the Corporation's stock," or "The Corporation has duly filed all federal, state, and local tax returns required to be filed by it." The clause preceding the "will not deplete the inventory" language does not include the words "represents" or "warrants."

Also noteworthy is that although the "representations" purportedly survive five years, the promissory note is payable for a period in excess of five years, Plaintiff's interpretation of the contract to the effect that Hollister represented each day for five years that the inventory would exceed the value of the debt is incongruent with the contemporaneous agreement that the $145,000.00 note was payable for a period in excess of five years.

In *Green Avenue Apartments v. Chambers*, 239 S.W.2d 675 (Tex.Civ.App.—Beaumont, 1951), reh. denied, the Court cited the following from Williston on Contracts:

"The writing will be read as a whole and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose. The context and subject matter of a contract may show that in a particular sentence an ordinary word has an unusual meaning; or that a word whose meaning, taken by itself, is clear, has been accurately used. In general, a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons. 'Noscitus a Sociis' is an old maxim which summarizes the rule both of language and of law that the meaning of words may be indicated or controlled by those with which they are associated."

In the agreement at hand the parties used the language "represents and warrants" antecedent to specific assertions of existing fact. The parties agreed such assertions would be enforceable for five years. Hollister made no "representations" or

"warranties" with respect to the inventory. Consequently I find the plaintiff's continuing representation theory as applied to Hollister's promise not to deplete the inventory unduly strains the language of the contract. As Judge Hand said: "We must recognize, not only that there is a critical breaking point as it were, beyond which no language can be forced but that in approaching that limit the strain increases." *Eustis Mining Co. v. Beer, Sondheimer & Co.*, 239 F. 976, 982 (Dist.Ct.S.D.N.Y.1917). The promises with respect to maintaining the inventory were merged into the writing of May 17, 1978, and Hollister signed that document with the present intent to maintain the inventory. The fact that Defendant subsequently breached his promise does not make the debt non-dischargeable under a fraud theory. I hold Plaintiff has failed to show that Hollister committed a fraud within the meaning of § 523(a)(2) of the Bankruptcy Code.

### EPILOGUE

This is not to say that I condone the mismanagement of Hollister, or that no legal measures were available to protect Plaintiff against the loss he has sustained. I am also of the opinion that Plaintiff's loss was caused to some extent by his own lack of foresight in making the May 17, 1978 stock sale agreement. Miracle initially intended to take a lien on the inventory itself. If the inventory lien had been granted and properly recorded all creditors including the bank would have had actual or constructive notice of Miracle's pre-existing lien. Miracle waived this significant right negligently relying on Hollister's lay opinion that a release would have to be obtained before each item of inventory could be sold free of liens. This is not a correct statement of commercial law. A buyer of an item of inventory in the ordinary course of business takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence, see Tex.Bus. and Comm.Code §§ 9.307, 1.201.[3] Hollister would not have to obtain a release from Miracle to sell inventory in the ordinary course of business free of Miracle's security interest. Miracle's neglect in properly securing his interest in the corporate assets was clearly a contributing factor to his loss.

Plaintiff, Don Miracle, requested relief against Defendant, Thomas Hollister, is hereby DENIED. The foregoing constitutes findings of fact and conclusions of law pursuant to F.R.C.P. 52.

---

3. To be sure, securing the sale of a small corporation on credit has unique problems. If Hollister and Taylor granted a lien on the inventory as security for their personal debts arising out of the stock purchase, the corporate guarantee prohibition of V.T.C.S. art. 1302–2.06 may be applicable. However by the enactment of Article 2.04 A of the Texas Business Corporation Act the legislature precluded a corporation from pleading the above ultra vires rule as the basis for a claim or defense, *Inter-Continental Corp. v. Moody*, 411 S.W.2d 578 (Tex.Civ.App. —Houston, 1967). I am of the opinion that if a security interest on the inventory had been properly recorded the bank would not have been willing to lend the corporation $80,000.00 relying on the inventory as security. By failing to take a lien on the inventory, the seller created a situation in which inventory depletion by means of a subsequent mortgage was foreseeable.