In re Thresher Ames **RIPPEY, III,**
et al., **Bankrupt.**

**NATIONAL CAR RENTAL
SYSTEM, INC., Plaintiff,**

v.

Thresher Ames **RIPPEY, III,** et
al., **Defendants.**

**Bankruptcy No. BK3–76–549–F.**

United States Bankruptcy Court,
N. D. Texas,
Dallas Division.

July 30, 1982.

Ron V. Berkowitz, Dallas, Tex., for plaintiff.

William M. Jones, Dallas, Tex., for debtor.

## MEMORANDUM OPINION

JOHN C. FORD, Bankruptcy Judge.

Plaintiff, National Car Rental System, Inc., ("National"), brings this action seeking to except from discharge an obligation owing by the Bankrupt, Thresher Ames Rippey, III, ("Rippey"). Having missed the bar date for filing a general objection to discharge, National was, however, permitted to file an exception to the discharge of a debt pursuant to 11 U.S.C. § 17a(2) (repealed), which excepts from discharge "liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extention or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive."

## FINDINGS OF FACT

During the early 1970's Rippey was engaged principally in the real estate raw land development business in Dallas County. Rippey enjoyed a good reputation in the business community, and he accumulated considerable holdings of raw land suitable for development. In the spring of 1973, Mr. Arnold Trentelman approached Rippey with a business proposition whereby Trentelman would organize and operate a trucking line to be called Friendship Lines, Inc., ("Friendship"). Rippey expressed interest in becoming involved in the new business once it was ready to begin operations. Later, in the late spring or early summer of 1974, Trentelman advised Rippey that he had obtained several lucrative trucking contracts with food producers and that the Friendship business was ready to be launched. Trentelman asked Rippey to become one of a number of vice-presidents of the newly formed company. Although named a vice-president of the company, Rippey was given little or no responsibility managing the daily operations of Friendship. Instead, Rippey's role appears to have been one of lending financial backing and support to the neophyte company. In this regard, Trentelman asked Rippey and other officers of the company for their financial statements. Rippey gave Trentelman his financial statement dated May 31, 1974.

There is no question that Rippey's statement accurately reflected his net worth as of the May 31, 1974, date on which it was

prepared. The statement reflects over seven million dollars of equity, at least on paper, in various pieces of real property that Rippey owned. The single most valuable piece of property listed on the statement was located on Campbell Road and had over five million dollars of equity listed on the schedules. Sometime in the late summer of 1974, Rippey became embroiled in financial difficulties. Unable to make the payments on the Campbell Road property, Rippey was forced to deed the property back to the mortgage holder. By late September 1974, Rippey no longer owned any interest in the Campbell Road property. However, due to the potential for development of the Campbell property, the mortgage holder had cancelled the five million dollar mortgage liability on the Campbell Road property when Rippey deeded the property back. Having lost all of his ownership interest in the Campbell Road property, Rippey's May 31, 1974, financial statement was no longer accurate. Instead of eight million in equity, Rippey had no more than three million in equity by late September 1974.

In late July and early August of 1974, Trentelman had entered into negotiations with National for the rental of twenty-five tractors and twenty-five trailers. Trentelman signed a leasing agreement with National on August 14, 1974, as president of Friendship Lines, Inc. A corporate guaranty of the leasing agreements was signed the same day. Rippey's involvement in the August 14th leasing transaction appears to have been virtually non-existent. Rippey and Trentelman had met earlier in the summer with National's local salesman, a Mr. McNamara, at a local bar where they discussed "girls and music." Mr. Donavan Riley, executive vice-president of National in charge of truck leasing, testified that he had never spoken with nor met Rippey. Riley signed the leasing agreements on behalf of National. Rippey's influence in encouraging National to enter the leasing arrangement probably was limited to creating an impression in Riley's mind that "with Mr. Rippey purported to be a wealthy person in the background, it then became I'm sure a viable leasing arrangement." (Riley deposition page 21.)

According to Riley's testimony, Friendship did not have the credit stature normally required to sustain the leasing of a fleet of tractor and trailer rigs. For reasons unknown, National went ahead and approved the leasing transactions entered into on August 14, 1974. Perhaps as a result of rethinking the actions already taken, National asked for, and received, Rippey's personal guaranty of the August 14th agreements. Rippey signed the first guaranty on September 5, 1974, and on September 23, 1974, Rippey signed a second personal guaranty of the leasing agreements. Despite having been required to sign two personal guaranties, it is the finding of this Court that Rippey had never communicated with Riley, the National corporate officer in charge of approving the Friendship leasing arrangements. Moreover, even if we assume that National relied upon Rippey's financial statement when making the decision to enter into the leasing arrangement, it is the finding of this Court that Rippey's financial statement dated May 31, 1974, was a true and accurate reflection of Rippey's financial condition as of August 14, 1974. Therefore, at the time Friendship and National entered into the leasing arrangement on August 14, 1974, Rippey's financial statement could be relied upon to reflect an accurate and true picture of his financial condition.

Although Rippey did not provide National with an updated financial statement, Rippey did keep Trentelman apprised on a regular basis of changes in his financial situation. It is unclear whether Trentelman advised National of changes in Rippey's position although nothing in the record indicates that Rippey was aware of Trentelman's failure to keep National advised. Lacking any evidence to the contrary, it is the finding of this Court that Rippey reasonably and in good faith relied upon Trentelman to relay updated financial information to National. The failure to produce Trentelman and McNamara as witnesses at the trial precluded the possibility of establishing whether Riley or McNamara

received notification of a change in Rippey's financial condition. Riley's deposition testimony to the contrary is vague and not credible. Although the financial statement dated May 31, 1974, was false at the time Rippey signed the personal guaranties, National failed to provide convincing testimony at the trial contradicting Rippey's testimony that he had kept Trentelman informed of changes in his financial condition. Rippey's testimony, corroborated by Riley's deposition testimony, is convincing insofar as it attests to no direct contact between Rippey and National. The inference remains that Rippey relied in good faith on Trentelman to advise National of any changes in his financial condition.

For reasons unknown, Friendship failed to operate successfully and subsequently defaulted on the leasing agreement payments to National. National turned to Rippey to satisfy the outstanding deficiencies. Rippey was unable to pay the Friendship debt having fallen into hard times in his own real estate business. National obtained a default judgment for $584,231.75 on July 26, 1976, against Rippey. On September 10, 1976, Rippey filed a voluntary petition in bankruptcy, seeking to discharge the National judgment claim along with other scheduled debts.

## CONCLUSIONS OF LAW

Although the National claim was reduced to judgment in a state court proceeding, the judgment merely liquidates the amount of the liability, it does not affect the nature of the claim behind the judgment. See 1A *Colliers on Bankruptcy*, ¶ 17.16(4), p. 1643 (14th ed.). The default judgment admitted into evidence as Creditor's Exhibit No. 1 contains no findings of fact whatsoever other than a recital of Rippey's failure to appear or answer. The case at bar presents as the gist and gravamen of the cause of action the question of whether Rippey obtained an extension or renewal of the Friendship leasing agreements by publishing a false financial statement with the intent to deceive.

■ The fraud exceptions to discharge are founded in tort rather than contract. *In re Hollister*, 13 B.R. 178, at 183 (Bkrtcy. 1981). Thus, the bankrupt's duties and actions are fixed by law, not by the parties themselves. In the case at bar, National must prove Rippey's actions constituted intentional wrong with the imputation of bad faith or immorality. See 1A *Colliers*, supra. at p. 1634, note 15. No evidence has been presented showing bad faith on the part of Rippey in presenting the financial statement and then executing the personal guaranties. Evidence was adduced, however, showing that Rippey acted in good faith by keeping Trentelman advised of changes in his financial condition. It is not unreasonable given the circumstances wherein Rippey had no direct contact with National for Rippey to rely upon Trentelman to keep National advised of material changes in his financial condition.

■ Cases involving an initial truthful representation of financial condition wherein subsequent extensions of credit are granted after a deterioration in financial condition are split concerning the debtor's duty to inform the creditor of changes in the debtor's status. See 1A *Colliers*, supra. at p. 1642, note 28; and *Hollister*, supra. at 183 for a discussion of the leading cases. The peculiar circumstances of the case at bar wherein the bankrupt was not obtaining property for himself mitigates in favor of applying the logic of those decisions placing no affirmative duty upon a debtor who initially makes a truthful statement to correct it when his circumstances have changed. Consequently, National had no right to rely upon Rippey's May 31, 1974, financial statement as a continuing representation of Rippey's financial condition. Failing to carry its burden of proof regarding actual reliance, National also cannot assert a contractual right to rely upon the financial statement. The timing of the execution of the personal guaranties by Rippey nearly three to six weeks subsequent to the signing of the leasing agreements between National and Friendship severely weakens National's argument that they relied upon Rippey's personal guaranty to enter into

the leasing agreement. Moreover, Riley's deposition testimony concerning National's reliance on Rippey's May 31, 1974, financial statement is vague and not convincing. In any event, even if Rippey had some duty to inform National of changes in his financial circumstances and assuming further that National could rely upon the financial statement, Rippey discharged his duty to inform National by transmitting the information concerning his changed circumstances to Trentelman for transmittal to National. Rippey's actions were taken in good faith and do not rise to the level of intentional wrong or moral turpitude suggested by case law as necessary for barring a discharge of a specific debt.

In addition, it should be noted that § 14c(3) of the 1898 Act provides for the denial of discharge to the bankrupt if the bankrupt "while engaged in business as a sole proprietor, partnership, or as an executive of a corporation, obtained such business money or property on credit or as an extension or renewal of credit by making or publishing or causing to be made or published in any manner whatsoever a materially false statement in writing respecting his financial condition or the financial condition of such partnership or corporation." Having missed the bar date for filing an objection to discharge pursuant to § 14c(3), National has lost the opportunity to defeat the general discharge granted Rippey. It has been held that the § 17a(2) exception to the discharge of a debt is inapplicable where the bankrupt obtained no property for himself, but, for example, by false representations induced a contractor to accept the bankrupt's guaranty of payment under a construction contract with a third person. See *Harrod Construction Corp. v. Englander,* 152 Misc. 173, 273 N.Y.S. 136 (1934); and 1A *Colliers,* supra. at 1630, note 5, and cases cited therein.

It is not necessary for this issue to be reached in the case at bar because National has failed to establish the intent to deceive necessary for denial of a discharge of this specific debt. However, even if National had proved an intent to deceive, the exception of § 17a(2) would be held to be inapplicable in the case at bar since there has been no showing that Rippey obtained property for himself.

After careful consideration of the testimony, exhibits, pleadings, and arguments of counsel in this case, I find that the debt owed by Rippey to National is dischargeable.