263 F.Supp. 658 (1967)
In the Matter of SOLARI FURS, a copartnership of which Theodore Rosenberg and Robert Rosenberg are the partners, and Theodore Rosenberg and Robert Rosenberg as individuals, Bankrupts.
No. 62B 444(3).
United States District Court E. D. Missouri, E. D.
January 27, 1967.
*659 *660 Gleick, Strauss & Friedman, St. Louis, Mo., for petitioning creditors.
Warren S. Earhart, Kansas City, Mo., for bankrupts.
Robert C. Dodson, Receiver and Trustee, Festus, Mo., Harry S. Gleick, St. Louis, Mo., for trustee.

*661 MEMORANDUM OPINION AND ORDER
REGAN, District Judge.
For consideration are the separate petitions of Robert Rosenberg and Theodore Rosenberg for review of the orders of Referee in Bankruptcy William O'Herin sustaining certain specifications of objections to their discharge filed by the trustee in bankruptcy and denying their discharge.
Theodore and Robert Rosenberg, father and son, were engaged in the fur business in the City of St. Louis as partners under the firm name of Solari Furs. Theodore also operated a fur business in Kansas City. Robert managed Solari Furs. As the Referee states in his memorandum opinion, "the life of the business was short and disastrous for creditors", starting February 1, 1960 and ending when the partnership and the individual partners were adjudicated bankrupt following the filing, on March 23, 1962, of an involuntary petition in bankruptcy.
The Referee sustained specifications 7, 8 and 9 of the objections to Robert Rosenberg's discharge, and specifications 1, 2 and 3 of the objections to Theodore Rosenberg's discharge. The objections were tried together, the Referee filing a single memorandum opinion covering the objections in both individual estates. The petitions for review were briefed and argued together in this Court, and are so disposed of in this opinion.
Specification 7 of the objections to Robert Rosenberg's discharge, and Specification 1 of the objections to Theodore Rosenberg's discharge each alleges that in the operation of the partnership said bankrupt "has failed to keep or preserve books of accounts or records from which its financial condition and business transactions might be ascertained," and sets forth various specific allegations of fact in support of the general charge.
Specification 8 of the objections to Robert Rosenberg's discharge and Specification 2 of the objections to Theodore Rosenberg's discharge each sets forth, with factual amplification, that said bankrupt "has failed to explain satisfactorily the loss of assets of the bankrupt partnership or the deficiency of assets to meet the liabilities of said partnership."
Specification 9 of the objections to Robert Rosenberg's discharge and Specification 3 of the objections to Theodore Rosenberg's discharge each alleges that said bankrupt obtained property or credit for the partnership "by making or publishing or causing to be made or published a statement in writing respecting the financial condition of said partnership that was materially false, the statement in question being a certain balance sheet purporting to be as of December 31, 1960, which was circulated by delivery to the creditors, to mercantile credit agencies, to Associated Fur Manufacturers, Inc., being an organization of fur merchants furnishing credit information and which the bankrupt knew furnished credit information to those suppliers of merchandise with which the bankrupt did business", and then, after setting forth a number of respects in which the financial statement was allegedly materially false, each specification further sets forth that "said financial statement was widely circulated in the trade, and among those firms with which the bankrupt intended to obtain credit and from which the bankrupt did obtain credit, and were circulated for the purpose of obtaining credit, and that said statement was circulated by the bankrupt for the specific purpose of obtaining such credit, and the creditors of the bankrupt relying upon said statement and figures contained therein did extend credit, and that such creditors relying thereon and extending credit have not been paid but are now creditors of the bankrupt partnership."
As originally filed, each of the foregoing specifications was prefaced with the allegation that the bankrupt "has committed an offense punishable by imprisonment as provided under Title 18, United States Code, Section 152, in that said bankrupt * * *." On ex parte motion of the trustee, after the expiration *662 of the time for filing objections, the specifications were amended by striking the foregoing prefatory allegation.
Bankrupts have preserved their objections to the amendments, contending that the amendments constitute the assertion of "new, different and additional grounds of objection." We do not agree. The Referee was clearly correct in overruling the amended motions to dismiss and in admitting evidence in support of the specifications of objections as amended. As the Referee pointed out in his memorandum, the stricken portion in each instance "was then followed by allegations showing that the charges came under Section 14c(2), (7) and (3) of the Bankruptcy Act rather than Section 14c(1) pertaining to crimes. * * * Not a word of allegations making the charges was stricken and not a word added. The allegations in the specifications here in question fully apprised the bankrupt of the charge against him. He could in no manner be misled, surprised or prejudiced by the mere striking of reference to Section 14c(1) of the Act when a mere reading of the specifications show that such was an inadvertence."
If authority is deemed necessary to support our holding, see In re Schmerel, D.C.N.J., 120 F.Supp. 899, 900; In re Taub, 2 Cir., 98 F.2d 81, 82; In re Zaidins, D.C.Wis., 182 F.Supp. 543; and Burchett v. Myers, 9 Cir., 202 F.2d 920.
Bankrupts also argue that the specifications relating to the financial statement are defective as a matter of law in that they do not set forth the names of the creditors who extended credit nor what credit was obtained. The cases cited in support of this contention do not involve comparable situations. In those cases the allegations, at best, contained nothing more than the language of the statute, and some did not even contain that.
In the instant case, the specifications in question state at length what was done in language which is sufficiently clear and explicit to apprise bankrupts of the basis of this objection. Bankrupts do not contend, nor could they reasonably do so, that they were surprised or otherwise prejudiced in defending against this specification, and that is the test which should be applied. Kaganowitz v. Manufacturers Trust Co., 2 Cir., 145 F.2d 754. Although it is true that the names of the creditors are not set forth specifically, sufficient is alleged to inform bankrupts of their identity. Moreover, bankrupts' counsel participated without objection in the taking of depositions in New York City of certain creditors and of representatives of the credit agencies. Thus, prior to the time of the hearing before the Referee, bankrupts were fully aware which specific creditors were claimed by trustee to have extended credit on the faith of the false financial statement.
We also deem it of importance that although bankrupts filed motions to dismiss at the commencement of the hearing and also objected to the introduction of evidence, these motions were in general language only and merely stated that the specifications in question (as well as others therein listed) "do not state facts sufficient to constitute grounds for an objection to the discharge." This allegation does not contain even a hint that bankrupts were basing their motions on the ground now argued. The specific objection was first disclosed in an oral motion to dismiss made on behalf of Theodore Rosenberg at the conclusion of the hearing before the Referee. It was not, however, referred to in the petitions for review. No prejudice having been shown, we hold that Referee was correct in overruling the motions to dismiss and the similar objections to the introduction of evidence.
On the merits, we consider the specifications which were sustained by the Referee in the order in which he discusses them in his memorandum.

Financial Statement
The Referee found that bankrupts had obtained property on credit by causing *663 to be published a materially false statement in writing respecting the financial condition of the partnership. We are in accord with this finding. Evidentiary facts supporting this specification of objections as to each bankrupt are set forth in some detail in the Referee's memorandum opinion. We briefly summarize some of these and other facts of record.
The policy of fur manufacturers in New York was to extend little, if any, credit, particularly to a new firm, without a financial statement, and bankrupts were so informed. It was for the very purpose of obtaining credit that the bankrupts caused the financial statement of the partnership to be prepared as of December 31, 1960. This statement, admittedly signed by both partners, consists of two sheets, the first page being a balance sheet, and the second page a profit and loss statement. The statement was submitted by petitioners' New York resident buyer, at their instance, to Associated Fur Manufacturers, Inc., (Association), and to Cohen-Manheimer Credit Bureau, Inc.
The Association is a credit rating agency for fur manufacturers in New York, with a membership of about 700 in New York City. As the Referee states in his opinion, "Upon receipt of a financial statement, the Association analyzes the figures as to current assets, current liabilities and goes into the operating figures furnished; it takes into account the investment figures, net worth and working capital. A credit report is then prepared. It is based on the financial statement; without a financial statement being furnished the Association will not recommend an account for credit."
We believe it is clear that the Association would not have recommended a line of credit for the partnership absent the financial statement submitted to it for that purpose. And it is further clear that at least some of bankrupts' creditors, e. g., Simes & Resnick, Inc., Reckler & Lamazor, Krauss Brothers, Zimmerman-Scher, Inc. and Schreibman Bros. Mfg. Corp. would not have shipped merchandise to them on credit had not a financial statement been issued and a recommendation of credit in some amount been made. Although the credit report prepared by the Association for its members did not contain all of the information contained in the statement furnished to it, such detailed information was a factor and was relied upon by the Association not only in preparing its own statement to creditors but also, and of equal or greater importance, in recommending the extension of credit.
The credit report prepared by the Association, summarizing bankrupts' December 31, 1960 financial statement, sets forth the totals of their represented current assets, current liabilities, working capital and net worth, as well as cash, accounts receivable, and merchandise. On bankrupts' statement, the net worth figure of $35,700 purports to consist of the aggregate of (1) an initial investment as of February 1, 1960 by Robert Rosenberg of $5,056.69 and by Theodore Rosenberg of $15,170.08, and (2) an alleged net profit for the business of $15,517.18 (less $43.65 donations and withdrawals). On the Association's summary to the creditors, the net worth figure was not broken down, only the total amount of the net worth being stated.
The Referee found, we believe correctly, that Robert Rosenberg made no investment at all and that the initial investment of Theodore Rosenberg was substantially overstated, at least to the extent of $8,836, now claimed by him to have been a merchandise capital contribution.[1] We find, as did the Referee, *664 that the initial investment figures set forth on the bankrupts' financial statement were materially false.
Bankrupts rely on the fact that although the condensed summary prepared by the Association does copy the same total net worth amount contained in bankrupts' statement, the summary does not include the items, in particular the initial investment figures, which bankrupts represented made up the net worth. They point out that by adding together the value of their current assets, fixed assets and other assets, as represented by them on their statement, and subtracting therefrom the amount of their liabilities the same resulting figure as to net worth is reached. On this premise, bankrupts contend that absent evidence and specific findings that either their assets or liabilities were materially misrepresented and that the creditors relied on such false information, there is a failure of proof respecting this specification of objection.
We are not impressed with bankrupts' argument. For one thing, we believe that implicit in the finding that the initial investments were materially overstated is a finding that bankrupts' net assets are overstated to the same amount. This was the first year in which the partnership did business. It follows that whatever the net worth of the business, to the extent that it did not consist of net profits, it could only result from the amount of the initial investment of the partners. Bankrupts do not contend, and there is no suggestion in the evidence, that the net profits were understated by them, and any such contention, if made, would be inconsistent with bankrupts' tax returns.
Certainly, net worth is not derived from thin air. Since there was a substantial overstatement of initial investment, it necessarily follows that the valuation placed upon the current assets is suspect. It is self-evident that the figures represented as bankrupts' initial investment must necessarily have been incorporated in the amounts set forth as their current assets, because otherwise it would have been impossible to balance the balance sheet.
Significantly, the purported inventory of December 31, 1960 does not adequately identify the garments listed, either by number, manufacturer or otherwise, so that its accuracy cannot be verified. Parenthetically, we note that bankrupt Robert Rosenberg testified that one year later he substantially overstated the inventory then taken by including therein consignment merchandise and customers' garments, because of his alleged ignorance of what a physical inventory should include. Although, as appears infra, we do not accept this explanation, bankrupts may well have been equally reckless in representing the amount of their inventory as of December 31, 1960.
In any event, the very purpose of stating the amount of initial investment was to influence others to act favorably. It does not lie in the mouths of bankrupts, who made the representations, to argue at this time that their representation as to initial investment is immaterial because the same result arithmetically could be reached in another way with the use of other unverified figures submitted by them. An analysis of a financial statement involves more than mere arithmetic.
In view of the manner in which bankrupts kept records, or failed to keep them, it would have been impossible for the trustee to have shown by specific evidence the falsity of the figures listed as current assets. For that very reason, it was sufficient in the circumstances of this case to demonstrate the falsity of the initial investment figures and thereby call upon bankrupts to present evidence of the *665 verity of their represented figures as to net worth, a burden which they wholly failed to sustain.
Certainly, there is no evidentiary basis for finding that the Association would have recommended bankrupts for credit absent their representation as to initial investment. That is the very crux of the matter. Clearly, the Association was influenced by this false representation to recommend the partnership for credit. And as we have noted, the evidence is well-nigh conclusive that at least some of the creditors would have extended the partnership no credit at all except for the recommendation made by the Association. It is true that creditors extended more credit than was recommended, but this is immaterial. What is of importance is the fact that credit was extended rather than the amount thereof.
That individual creditors may not have seen the original financial statement itself as prepared by bankrupts, nor even that the Association's summary did not break down the net worth total to show initial investment does not negate reliance by the creditors on the false representation. The evidence demonstrates that bankrupts submitted the statement to the Association for the purpose of obtaining its recommendation for credit, and that the creditors delegated to the Association the responsibility of studying the statement as submitted by bankrupts and on the basis thereof recommending to the creditors a line of credit. In so doing, the Association was acting as the agent or representative of the creditors. In this factual context, reliance by the agent was reliance by the principal. Property would not have been furnished on credit to the partnership had not the false representations been made to the Association for the very purpose of obtaining such property on credit. In any event, such false representations were a material factor in causing the Association to recommend the partnership for credit.
We find, therefore, that property was obtained by the partnership on credit as a direct result of the making and publishing to the Association of the materially false statement respecting the net worth of the partnership, and in particular the initial investment as represented by bankrupts. As was pointed out in Rogers v. Gardner, 9 Cir., 226 F.2d 864, 867, "[T]he statute is primarily concerned with the result which the false statement accomplishes". In Rogers, the false statement was used by the agency in working its code report rating the bankrupt, and it was this code report (which "did not incorporate the financial statement") upon which the creditor relied. So, too, in the present case, it was the recommendation for credit based upon the bankrupts' materially false representations upon which creditors relied. See also Yates v. Boteler, 9 Cir., 163 F.2d 953. "It is enough if the representations of the bankrupt had a material influence in securing goods, and that the creditors in question would not have made the sale except for them." In re Kyte, D.C.Pa., 174 F. 867, 871.
As we have noted supra, bankrupts also caused an identical copy of their financial statement of December 31, 1960 to be delivered to Cohen-Manheimer Credit Bureau, Inc., another credit rating agency in New York. Several creditors, e. g., Kupchick-Gelman, Inc., thereafter made telephone inquiry of Cohen-Manheimer Credit Bureau concerning Solari Furs, and in each instance Mr. Jerome Smith, the executive director of the credit bureau, read to the creditor the entire contents (not a summary) of the financial statement and recommended a line of credit. We find that Kupchick-Gelman, Inc. relied, at least in part, on the information contained in bankrupts' financial statement, including the false representations as to initial investments.
At the very least, the Trustee has shown to the satisfaction of the Court that there is reasonable ground for believing that bankrupts obtained property for their business by a materially false financial statement. It thereupon developed upon bankrupts to prove the contrary. Rogers v. Gardner, 9 Cir., 226 F.2d 864, 866. In our opinion, bankrupts have wholly failed to sustain their burden.

*666 Failure to Keep Proper Books and Records

The evidence amply supports the finding of the Referee that bankrupts failed to keep or preserve books of account or records from which the financial condition and business transactions of the partnership might be ascertained. We are satisfied that there are reasonable grounds for so believing.
Bankrupts contend that adequate records were kept and that they have sustained their burden of so showing. We do not agree. True, no particular form of record keeping is required nor is the statute concerned with impeccable bookkeeping. Nevertheless, the nature of the business in which bankrupts were engaged and the volume of their transactions[2] were such as to make it imperative that the books and records of the business be kept in a reasonably understandable and complete manner, crude though it may be. "There must be books or records from which the bankrupt's financial condition can be determined with a fair degree of accuracy and from which his business transactions can be traced for a reasonable period into the past." Burchett v. Myers, 9 Cir., 202 F.2d 920, 926.
Even if it be assumed that the books and records they kept were sufficient for bankrupts' private purposes, such is not the test. What was said In re Snyder, D.C.Ohio, 112 F.Supp. 897, 899, is here applicable: "The records are for a broader purpose than self-satisfaction. There should be records of the character that would permit the ascertainment of the Bankrupt's financial condition by those who had a right to know what his transactions were and the extent of his financial dealings. One examining all the written data the Bankrupt had certainly would be unable to ascertain what the Bankrupt's real financial condition was at any given time, or what had become of the property or assets known to have come into his possession and control."
We have carefully examined all of the books and records of bankrupts which were introduced in evidence and are convinced that the records which were kept are insufficient to afford a reasonably complete and understandable picture of the financial condition and business transactions of the partnership.

Failure to Explain Satisfactorily Loss of Assets or Deficiency of Assets to Meet Liabilities
The Referee considered this specification together with that of bankrupts' failure to keep proper books or records, and unquestionably they may properly be so considered. "Creditors are not required to risk the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records." Burchett v. Myers, 9 Cir., 202 F.2d 920, 926. We agree with the findings and conclusions of the Referee on this issue, and incorporate them herein by reference. We are satisfied that there are reasonable grounds for believing that bankrupts have failed to make the required satisfactory explanation and that they have not sustained their burden of proof on this issue.
The records of bankrupts were kept in such a manner that there was no way of determining therefrom at any given time just what items of merchandise were or should have been in stock. Bankrupts argue to the contrary, and set out in their brief a "method" whereby, so they claim, all items of merchandise purchased by them can be traced and their inventories verified. This "method" is hypothetical only, and in many instances would be impossible to follow. Briefly, bankrupts claim that every purchase invoice lists each garment with its own identifying number, that the dollar amount of such purchase is then entered in the purchase journal, and the identifying garment *667 number is entered on the sales inventory when sold, and each sale is then entered in the cash receipt book. Although such a procedure might be applicable in some instances, our independent study of the records shows that in many other cases such a practice was not followed.
Very few purchase invoices were introduced into evidence, and even some of these, e. g., Exhibits 41 and 42, do not bear an identifying number for each garment. On those Exhibits the same number is given for each item. Even were it otherwise, to apply bankrupts' "method" would require the creditors (and the Court) to do what bankrupts have not attempted to do, that is, examine every purchase invoice and from such documents make a list of each garment together with the identifying number thereof, then make a similar listing from all the sales invoices and after doing so check the numbers on the first list with those on the second for the purpose of determining which garments were sold, and after doing so make a comparison of the items remaining on the first list with the garments which are described on the inventories, to see if there is a discrepancy.
That such a procedure could not possibly be followed is apparent upon an examination of various records in evidence. Thus, we find a number of "job lot" sales to other dealers which do not contain identifying numbers for the garments sold. For example, Order No. 215 for "33 pcs. natural mink stoles", an unnumbered order dated October 11, 1961 for "26 pcs. job lot furs", Order No. 826 for "job lot of mink, 9 jackets, 5 stoles", and Order No. 836 for "33 splits . . . 2 let out stoles . . . 1 mink coat". There are other such invoices, among them Invoice No. 109, which lists 7 mink stoles and 2 mink coats, none with identifying numbers, and Order No. 822 for "job lot 3 mink coats", which, peculiarly, has a single identifying number. Then, too, Invoice No. 108 lists 3 mink stoles, but contains only one identifying number. Invoice No. 128 simply shows "job lot mink on special purchase", without disclosing in any way what the job lot consisted of either as to number of garments or the type thereof. We also note that Invoice No. 112, listing a number of garments, shows two different coats with the same number.
The foregoing invoices evidence sales to dealers. We also find among the sales invoices sales to various individuals of different garments which bear the same number. Among these are Invoice No. 40080 and Invoice No. 40081, each for a different garment but both of which are No. 525. Similarly, we find No. 528 listed on three different sales invoices, Nos. 40069 and 40075 (these being mink coats), as well as Invoice No. 40057 (a mink stole). So, too, garment No. 215 is listed on Invoice No. 40054 (a stole), and also on Invoice No. 40055 (a jacket), each sale being to a different purchaser. In addition, some of the invoices to individual purchasers contain no garment number at all, e. g. Invoice Nos. 40052, 40053 and 40058.
The explanation given by Robert Rosenberg for the unidentified "job lot" sales was that the purchaser requested that the sale be handled in such manner. Wholly apart from the suspicion which would naturally attach to a transaction of that nature, bankrupts could have complied with any such requests in writing the invoice and at the same time have kept their own records specifically describing the garments involved in the transactions.
Complicating the situation is the fact that on some sales invoices there is found the abbreviation "Ret", which, according to Robert Rosenberg, simply means that the garments therein listed were subsequently returned to bankrupts. However, there is absolutely no way of ascertaining the date any such returns were made or tracing the garments involved. This is a strange way of keeping records.
Bankrupts' inventory dated December 31, 1961 lists merchandise at a cost in excess of $70,000. According to Robert Rosenberg, he mistakenly included in the inventory garments belonging to customers and merchandise on consignment which did not belong to bankrupts, resulting *668 in an error of about $35,000. The Referee did not believe this explanation. In any event, no records were produced to substantiate the claim of error, and no attempt was made by bankrupts to point out which of the garments listed in the inventory should not have been included therein.
We also note that although this inventory does contain numbers for each of the garments listed thereon, some of these numbers are identical, even though they were for different garments, e. g., Nos. 212, 528, 1758 and 2210 are so listed for more than one garment. Parenthetically, on Sales Invoice No. 127 there is described an entirely different type of garment bearing the number 212 than the garment on the inventory with the same number. If it be assumed that these numbers are style rather than identification numbers, the result would be to make it the more impossible to follow the "method" contended for by bankrupts, since many more sales invoices would be without any identification numbers at all.
It would be impossible and would serve no useful purpose to attempt to set forth in this opinion all of the many similar discrepancies, as well as the other irregularities revealed by the books and records which have been placed in evidence. There are sales invoices to other dealers, e. g. Order No. 214 (Bankrupt Theodore Rosenberg's Exhibit 8) which describe the garments sold, contain what we assume are item numbers, and set out a separate price opposite each garment. The total of these listed prices on Order No. 214 is $5,845. However, someone wrote the figures 3000 on the invoice, and it would appear to us that this was done at a later date. (The invoice itself is a carbon copy, whereas the total is not, and it does not appear on the slip copy of the invoice). Robert Rosenberg testified that the price listed for the individual items is the cost price to bankrupts, which, if true, would be a peculiar way of preparing an invoice for approximately one-half of that amount. What is even more peculiar is the notation on the bottom of this invoice (originally a memo transaction) "Please let us know as soon as possible as we are short of coats." In any event, one of the garments, an Autumn Haze Mink Coat, No. 535, apparently is the same garment listed on the December 31, 1961 inventory at a cost of $1,950. Yet the price shown on the invoice is $1,795.
We also note that among the items on Theodore Rosenberg's Exhibit No. 7, which was said to be a purchase invoice (the actual invoice is Exhibit No. 39), there is listed a natural tourmaline mink stole with the number 670/9367 at the cost price of $550. The invoice is dated December 8, 1961. We find a sales invoice No. 116 dated December 14, 1961, recording a sale on which such a garment bearing the foregoing number is listed at the sale price of $450. Hence, the prices specified on the sales invoices were not necessarily the cost prices to bankrupts, but rather the sales prices to the purchaser. In the one instance we were able to check, the purchaser was Tibal Furs, which according to the evidence is the name under which Theodore Rosenberg, one of the bankrupts, operated a business in Kansas City. There is no explanation in the record of this strange transaction.
The balance sheet of February 28, 1962, which bankrupts contend explain their losses for the months of January and February, 1962, purports to show a loss on sales for that period of $94,622.44, exclusive of other expenses incurred during the two months. This balance sheet shows that during the two months involved, bankrupts made purchases of merchandise totaling $76,227.96 and had a beginning inventory of $70,799. An inventory taken as of February 28, 1962 lists merchandise at a cost of $13,904. The result is that the cost of the goods sold during the two-month period is $133,122.96. The total sales listed for the two months were $38,500.52, of which $25,850.52 were at retail and $12,650 were at wholesale. Subtracting the total sales from the cost of the goods sold results in the figure above stated of $94,622.44. *669 Robert Rosenberg testified that bankrupts' retail sales were always made at a profit, and there is no contention that such sales, certainly in the aggregate, were made below cost. Hence, we subtract the aggregate retail sales from the total cost of the goods sold (a procedure which assumes that the retail sales were made exactly at cost) to determine the cost of the merchandise sold at wholesale for $12,650. The resulting figure is $107,272.44. However, our inspection of bankrupts' sales invoices has disclosed two additional wholesale sales made in February, 1962, both to the same dealer, one for $327.50 and the other for $350, neither of which sales were recorded on the sales ledger  even though such sales antedated those which comprised the figure of $12,650. There is no evidence nor reason to believe from the face of the invoices that the two items involved in these additional sales were sold below cost. Adding the sum of these invoices to the wholesale sales brings the total to $13,327.50. Hence, the apparent loss on wholesale sales would be at least $93,944.94. The $12,650 figure is made up of only three sales, all in February, 1962. One is recorded on Sales Invoice No. 127, wherein according to Robert Rosenberg, merchandise costing bankrupts $16,675 was sold for $5000, a loss of $11,775. A second is the sale recorded on Order No. 214, referred to supra, wherein merchandise costing $5,845 was purportedly sold for $3000, a loss of $2,845. The total of these two losses is $14,620. Subtracting this sum from the total loss of $93,944.94 leaves a balance of $79,324.94 still to be accounted for. The only other wholesale sale recorded by bankrupts is one for $4,000, which is evidenced by Sales Invoice No. 128. This invoice describes the merchandise simply as "Job lot of mink on special purchase." We note that this invoice, which is undated except for the month and year, is the very last one in the sales invoice book. Absent any evidence whatever as to the items comprising this "Job lot of mink", the cost price of each of the garments included therein, or the circumstances of the sale, we cannot assume that bankrupts sold such garments at 1/20th of their cost. And even if we were to accept the testimony of Robert Rosenberg that the beginning inventory was overstated by $35,000, thereby reducing the loss for January and February, 1962 by that amount, the two-month loss to be accounted for would still be in excess of $44,000, a figure which is more than 11 times the amount of the $4000 sale. We are convinced that this loss of assets and deficiency of assets to meet bankrupts' liabilities has not been explained satisfactorily. The bankrupt's duty is not merely to explain but to explain satisfactorily.
Bankrupts offered as their explanation for the loss of assets and the deficiency of assets to meet their liabilities, the sales of merchandise below cost. Although we do not question the fact there were such sales which would necessarily result in losses on the specific garments involved, the generality of bankrupts' explanation does not satisfactorily explain all of the losses nor the extent of the deficiency of assets to meet liabilities. Bankrupts failed to demonstrate the verity of their explanation with sufficient particularity. Brenner v. Gaunce, 9 Cir., 28 F.2d 606. And see In re Shapiro & Ornish, D.C.Tex., 37 F.2d 403, 406 (affirmed 37 F.2d 407).
The right to a discharge is a statutory privilege which should be granted only when the statutory conditions are met. As appears supra, we are convinced that bankrupts are not entitled to a discharge and that the order of the Referee denying them a discharge is right and should be affirmed.
Accordingly, it is hereby ordered that the orders of the Referee denying Robert Rosenberg and Theodore Rosenberg and each of them a discharge and sustaining the specifications of objections on the grounds set forth in his orders should be and are hereby affirmed.
NOTES
[1] Louis Nussbaum, bankrupts' accountant who set up the initial investment figures, testified on behalf of bankrupts that for said purpose, in addition to including the $8,836 figure for merchandise (without verification) and $5000 cash, he accepted for the physical assets, after deducting the unpaid balance of the purchase price of the business, an aggregate net valuation of $12,475.00. These assets, together with good will and some merchandise, had been purchased from the previous operator of a fur business on the premises for $9000 (of which some $6,000 was then unpaid). We also note that although the financial statement prepared by him set forth a lower initial valuation of the fixed assets than that Nussbaum had previously used in determining the "initial investment", there is no explanation of his failure to make a corresponding adjustment in the amount of the claimed initial investment.
[2] For example, their total liabilities, exclusive of tax claims, were listed in the schedules as in excess of $180,000, all unsecured. These debts are set forth on six pages of the schedules and are owing to approximately 100 creditors.