In re Charles C. KIM, Duak F. Kim, Debtors.

GREEN HILL CORPORATION and Abdoulalem Ghariani, Plaintiffs,

v.

Charles C. KIM and Duak F. Kim, Defendants.

Bankruptcy No. 86–01115–A.
Adv. No. 86–0541–A.

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

March 8, 1989.

John T. Donelan, Long, Donelan & Test, Alexandria, Va., for debtors.

Raymond D. Battochi, Cole & Grove, P.C., Washington, D.C., for plaintiffs.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr.,
Chief Judge.

■ This matter is before the court on the joint complaint of Green Hill Corporation ("Green Hill") and Abdoulalem Ghariani ("Ghariani") seeking a denial of the discharge of Charles C. Kim ("Kim") and Duak F. Kim ("Mrs. Kim") pursuant to 11 U.S.C. section 727 of the Bankruptcy Code or, in the alternative, a denial of the dischargeability of their debt under section 523. Kim asserts that Green Hill Corporation is not a proper party because its board of directors did not authorize its participation in this litigation. For the purposes of the section 727 counts, we need not address the issue of whether Green Hill Corporation's board of directors properly authorized its participation as a plaintiff due to the fact that the section requires only one party as an objecting creditor. *See* 11 U.S.C. § 727(c)(1). We therefore address the section 727 counts as raised by Ghariani.

Ghariani, who is majority owner of Green Hill Corporation stock, claims that Kim has concealed or failed to keep and preserve records from which Kim's financial condition may be ascertained, eliminating Kim's right to a discharge pursuant to section 727(a)(3). Also, Ghariani asserts Kim has made false oaths in connection with his case, preventing his right to a discharge under section 727(a)(4). As another basis for denying his right to a discharge, Ghariani claims that Kim has failed to satisfactorily explain his loss of assets, in violation of section 727(a)(5).

Ghariani's alternative claim is based on section 523. Ghariani describes a long list of incidents wherein Kim has converted funds from Green Hill Corporation with no intent to return such funds. Ghariani claims that these debts should not be discharged under section 523(a)(6). Additionally, Ghariani claims that Kim fraudulently induced Ghariani to lend Kim money which Kim never intended to repay, and hence, that this debt should also not be dischargeable pursuant to section 523(a)(2)(A).

First, we address the section 727 allegations, for if we deny the Kims a discharge under section 727, the section 523 claims become moot. We deal with the claims against Mr. and Mrs. Kim separately.

The record reveals that the debtor, Kim, is educated and experienced in business and financial matters. He received a bachelor's degree in International Business from New York University in 1965, a master's degree from George Washington University in 1968, and a doctors degree in business administration from George Washington University in 1973. He was the president of a construction company, has worked as a consultant, and was president of the Diplomat Bank in Washington, D.C. His testimony indicated that he understood that a SEC securities fraud injunction was entered against him in connection with his activities at the Diplomat Bank.

The record further reveals that in 1982, Ghariani furnished to Kim $300,000 for the purpose of establishing Green Hill Corporation. Kim established Green Hill Corporation as a Korean corporation to market clothing to Arab countries. From 1982 through most of 1985, Ghariani was the beneficial owner of 65%, and Kim the beneficial owner of 35% of Green Hill Corporation stock. Kim was president of Green Hill Corporation. Ghariani was the principal investor in and a director of Green Hill, but never held the position of an officer or employee.

Sometime prior to January 18, 1984, Kim opened a bank account at the Swiss Bank Corporation, Zurich, Switzerland. On April 6, 1984, Kim transferred $640,205 of Green Hill funds to the Swiss bank account. On October 20, 1984, Kim transferred an additional $521,980 to that account. Kim opened the Swiss Bank account in his own name, is a signatory on that account, and has exercised dominion and control over that account since its inception. Mrs. Kim as well as their two children are also signatories on the account and have access and control over the account. In spite of the signatory responsibility over the account, Kim has failed to maintain or preserve

records regarding the account. Kim has admitted that he did not keep or maintain any records regarding the account, and when shown a bank statement during his trial, he stated that he "wouldn't dare to read it." Kim claims he has turned bank statements over to an investor in Libya named Faisal Khalil, and at the same time claims that the bank statements and other records are in Korea kept by Green Hill employees. Kim testified that he has no ownership interest in the account because he maintained it only as an agent of Faisal Khalil (hereinafter "Khalil"). He testified that he paid Khalil a commission with Green Hill funds and that Khalil instructed Kim to open a Swiss bank account with the money. He further testified that Khalil instructed him to open the account in Kim's own name, and to make deposits and withdrawals at Khalil's direction. However, Kim has provided no writing or any other proof of the arrangement with Khalil other than Kim's testimony. The only written documentation produced in this connection was a commission agreement describing Khalil's right to a commission payment in return for Khalil's assistance in acquiring a large contract for clothing sales in Libya. However, in his testimony, Kim admits forging Khalil's signature on this agreement, claiming he was signing at Khalil's previous direction. Kim testified that he signed the agreement in Korea when he was not in the presence of Khalil. Kim explains that all other terms of the relationship with Khalil, especially the specific instructions regarding when Kim was to withdraw money from the Swiss account and to whom to send such funds, were recorded by Kim in a spiral notebook. Kim testified that he could not remember the transactions without the notebook. Neither could he produce the notebook, stating that it was stolen from him by Libyan authorities who later incarcerated him.

In addition to the Swiss bank account, Kim was a signatory on three bank accounts in Korea. One bank account had $200,000 in certificates of deposit. Kim testified that this was his personal asset, yet did not list it in his bankruptcy schedules originally filed with the court. On his amended petition, Kim listed the account as one of "several" belonging to Green Hill. He explained during the trial that it was his personal money and that he had pledged it to Green Hill. The second bank account was a separate payroll and travel reimbursement account kept by Kim's secretary, and the third bank account was held for Green Hill but was in Kim's own name. Kim testified that the money in the third bank account came from Ghariani. He admitted that he had an additional $700,000 in bank accounts in Korea, but later claimed the money was in the third account that was held for Green Hill. Kim failed to keep any records of any of these accounts. His testimony was that he never went to any bank in Korea to open, close or withdraw any money, hence, he doesn't know what is in any of the accounts. He further stated that the records are kept in Korea, but he has not demonstrated why he has not retrieved the records from Korea or why he did not personally maintain any records from his accounts. His testimony was that he does not recall the activity in and out of the accounts.

During his testimony at the trial, Kim revealed another source of income, for which he has no documentation and which is not listed on his bankruptcy schedules. Kim admitted that he received an inheritance from his father's estate in an amount between $350,000 and $500,000. He admitted that he did not report this income on his schedules, and that he transferred $150,000 of it to his bank accounts in the United States by hand delivering the funds in suitcases. He also testified that he transferred the rest of the inheritance to Khalil in Libya. Kim has no record of the inheritance or of the transfers and has offered no proof other than his own testimony.

The record establishes that Mrs. Kim is a signatory of the Swiss bank account. She testified that she signed whatever documents her husband requested. The testimony is uncontradicted that Mrs. Kim does not have the education or the experience of her husband, and that she did not participate in her husband's business.

Section 727(a)(3) bars a discharge if a debtor fails to keep or preserve records from which his financial condition or business transactions may be ascertained.[1] 11 U.S.C. § 727(a)(3); *In re Baxter*, 96 B.R. 58, at 60 (Bankr.E.D.Va.1989); *In re Minesal*, 81 B.R. 477, 480–81 (Bankr.E.D.Wis. 1988); *In re Shapiro*, 59 B.R. 844, 847–48 (Bankr.E.D.N.Y.1986). The standard for what constitutes a failure to keep or preserve records is an objective one. *See In re Miller*, 5 F.Supp. 913, 915 (D.Md.1934) ("[I]t is a question of applying a reasonable rule to the particular circumstances, giving due weight to the custom of the normal person under such circumstances.").[2] Records are adequate when they are kept so as to reflect, with a fair degree of accuracy, the debtor's financial condition and in a manner appropriate to his business. *In re Tackett*, 67 B.R. 354, 359 (Bankr.E.D. Tenn.1986); *Matter of Wilson*, 33 B.R. 689, 691 (Bankr.M.D.Ga.1983). To determine the adequacy of a debtor's financial records in light of his particular business, courts have considered several factors: the debtor's education, business experience, and sophistication; the complexity of the debtor's business; the amount of credit extended to the debtor during his business activity; and any other extenuating circumstances. *Minesal*, 81 B.R. at 481; *see In re Mart*, 87 B.R. 206, 210 (Bankr.S.D.Fla.1988) (inexperienced, unsophisticated debtor who relied completely upon her spouse regarding financial affairs granted discharge); *In re Drenckhahn*, 77 B.R. 697, 707 (Bankr.D. Minn.1987) (farmer debtor); *Matter of Escobar*, 53 B.R. 382, 384 (Bankr.S.D.Fla. 1985) (debtor with business administration and accounting training ran multimillion dollar international business denied discharge where he failed to keep adequate records even though foreign custom did not require records). It is important to note that a higher standard of care is required from a merchant actively engaged in high volume, complex business transactions. *See Goff v. Russell Co.*, 495 F.2d 199, 201–02 (5th Cir.1974) (operator of several retail stores with extensive liabilities held to higher standard than unsophisticated wage earner dealing primarily in cash). It is not the size of the business, but its complexity which fixes the bounds of the duty to keep records. *Baker v. Trachman*[3], 244 F.2d 18, 20 (2nd Cir.1957); *see Wilson*, 33 B.R. at 693 (high volume accounting business requires more than simple checkbook record); *In re Ellison*, 34 B.R. 120, 125 (Bankr.M.D.Ga.1983) (contractor who kept only cancelled checks and bank statements denied discharge for failure to keep books and records indicating to whom owed money or for which residence had supplied materials or labor).

The inquiry is not from the perspective of the debtor. Rather, it is from the perspective of third parties. As the court in *In re Solari Furs*, 263 F.Supp. 658, 666 (E.D.Mo.1967) noted,

> [e]ven if it be assumed that the books and records they kept were sufficient for [debtors'] private purposes, such is not the test.... [R]ecords are for a broader purpose than self-satisfaction. There should be records of the character that would permit the ascertainment of the [debtor's] financial condition by those who had a right to know what his transactions were and the extent of his financial dealings.

*Id.* (citing *In re Snyder*, 112 F.Supp. 897, 899 (E.D.Ohio 1953)). Section 727(a)(3) as-

---

**1.** Section 727(a)(3) provides:

(a) The court shall grant the debtor a discharge, unless—

....

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

**2.** This case was decided under section 14(c)(2) of the Bankruptcy Act, which reads substantially the same as the current section 727(a)(3) of the Bankruptcy Code.

**3.** *Baker v. Trachman*, 244 F.2d 18 (2nd. Cir. 1958) is decided under section 14(c)(2) of the Bankruptcy Act. This section is substantially the same as the current section 727(a)(3) of the Bankruptcy Code.

sures the trustee and creditors that they will be provided with sufficient information with which they can assess the debtor's estate and general financial posture. *Mart,* 87 B.R. at 210; *Drenckhahn,* 77 B.R. at 707; *In re McCall,* 76 B.R. 490, 497 (Bankr.E.D.Pa.1987). Although full detail is not required, there should be written evidence, orderly made and preserved, from which the present and past financial condition of the debtor may be ascertained with substantial completeness and accuracy. *Goff,* 495 F.2d at 201.

The burden of proof to show that the debtor failed to keep such adequate records is on the objecting creditor. Bankruptcy Rule 4005.[4] However, the rule is silent as to the level of proof necessary to sustain the burden. The Advisory Committee Notes to Rule 4005 explain:

> the rule does not address the burden of going forward with the evidence. Subject to the allocation by the rule of the initial burden of producing evidence and the ultimate burden of persuasion, the rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with evidence in the light of considerations such as the difficulty of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector ...[.]

Bankr.R.P. 4005, Advisory Committee Note. Likewise, the Code is silent regarding the level of proof necessary to sustain the burden, and the legislative history is inconclusive.[5] In the absence of clear legislative guidance, courts have split between a clear and convincing standard for the section 727 burden of proof and a preponderance of the evidence standard for the

section 727 burden of proof, generally applying the clear and convincing standard where the § 727 claim involves fraud and the preponderance of the evidence standard where no fraud is alleged. *Oriel v. Russell,* 278 U.S. 358, 362–63, 49 S.Ct. 173, 174, 73 L.Ed. 419 (1929) (where fraudulent concealment is alleged, clear and convincing evidence must be shown); *In re Garcia,* 88 B.R. 695 (Bankr.E.D.Pa.1988) (holding clear and convincing standard to prove fraud or fraudulent intent and preponderance of the evidence to prove other elements under § 727); *In re Johnson* [6], 82 B.R. 801, 804 (Bankr.E.D.N.C.1988) (clear and convincing standard where intent to defraud alleged); *In re Shepherd,* 56 B.R. 218 (Bankr.W.D. Va.1985) (clear and convincing standard required to prove fraud, but preponderance of the evidence is standard to prove dischargeability of fraud claim). *But see In re Parker,* 85 B.R. 384, 387 (Bankr.E.D.Va. 1988) (concluding a preponderance of the evidence the appropriate standard for § 727 fraudulent concealment claims).

The recent Fourth Circuit decision in *Combs v. Richardson,* 838 F.2d 112 (4th Cir.1988), appears to set as a uniform burden of proof in all dischargeability actions the preponderance of the evidence standard. *Id.* at 116. However, we do not believe that the ruling requires a preponderance of the evidence for all discharge and dischargeability actions. In *Combs,* the Fourth Circuit held that section 523(a)(6) actions require only a preponderance of the evidence to meet the burden of proof. *Id.* at 116. Section 523(a)(6) disallows discharge of debts arising from willful and malicious injury by the debtor, and does not mention fraud. *See* 11 U.S.C. § 523(a)(6). The Fourth Circuit stated that

---

**4.** Rule 4005 states: "[a]t the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection." Bankr.R.P. 4005.

**5.** The House and Senate Reports both state that "[t]his section is the heart of the fresh start provisions of the bankruptcy law ..." but provide no further explanation of the section. Instead, the reports merely restate the language set forth in the Code. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 384–85 (1977); S.Rep. No.

989, 95th Cong., 2d Sess. 98–99 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5884–5885, 6340–6341.

**6.** In *In re Johnson,* the court noted:
> [T]he standard of proof to establish an exception to discharge of debt under § 523 is 'clear and convincing' ... and this court believes that standard is applicable to objections to discharge as well."

82 B.R. at 804 (citing *Matter of Bogstad,* 779 F.2d 370, 372 (7th Cir.1985)).

because the Code does not state a level of proof, "[i]n the face of this silence, courts may not imply a higher standard than the preponderance standard normally applied in civil proceedings." *Id.* at 116. The standard of proof normally applied in civil actions alleging fraud is clear and convincing.[7] *See Oriel v. Russell,* 278 U.S. at 362–63, 49 S.Ct. at 174 ("charge equivalent to one of fraud ... must be established by the same kind required in ... a court of equity. A mere preponderance of evidence in such a case is not enough."); *Lissmann v. Hartford Fire Ins. Co.,* 848 F.2d 50, 53 (4th Cir.1988) (plaintiff has burden of showing fraud by clear and convincing evidence); *Huntly v. North Carolina State Bd. of Education,* 493 F.2d 1016, 1019 (4th Cir.1974) ("[o]ver the years a rule has wisely evolved that one who charges fraud must prove it by clear and convincing evidence"); *Holley Coal Co. v. Indemnity Co.,* 186 F.2d 291, 296 (4th Cir.1950) ("[W]hen fraud or dishonesty is an element of a civil suit, it must be shown by clear and convincing evidence."); *Martin v. Williams,* 194 Va. 437, 445, 73 S.E.2d 355, 359 (1952) ("[T]he rule is firmly established that fraud, when relied upon, must be ... proven by evidence that is clear, cogent and convincing.").[8] We hold that for the purposes of fraudulent intent or fraud claims, the correct burden of proof is clear and convincing evidence. However, where fraud is not alleged, as in section 727(a)(3) claims, the correct burden of proof is a preponderance of the evidence.[9]

Once an objecting creditor shows by a preponderance of the evidence that the debtor has failed to keep or produce adequate books or records, the burden shifts to the debtor to prove that the failure to do so was justified. Bankr.R.P. 4005; *In re Tackett,* 67 B.R. 354, 358 (Bankr.E.D.Tenn. 1986). Justification turns on the facts and circumstances of each case. *Goff,* 495 F.2d at 201; *In re Reitz,* 69 B.R. 192, 197–98 (Bankr.N.D.Ill.1986); *Wilson,* 33 B.R. at 692. The issue depends largely on what a normal, reasonable person would do under similar circumstances. *Wilson,* 33 B.R. at 692; *In re Weismann,* 1 F.Supp. 723 (D.N. Y.1932). The inquiry should include the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice. *Wilson,* 33 B.R. at 692; *see In re Gordon,* 83 B.R. 78, 80 (Bankr.S.D.Fla.1988) (debtor's level of sophistication in business transactions "makes her failure to keep sufficient books and records of her financial condition or business transactions unjustified"); *Minesal,* 81 B.R. at 481 (not justified where debtor was owner of trucking business for 34 years); *In re Roberts,* 81 B.R. 354, 380 (Bankr.W.D.Pa.1987) (not justified where debtor was well educated knowledgeable businessman with substantial investments).

The record in this case establishes that Kim has a collection of bank statements and no other records of his Korean

---

**7.** Historically, the clear and convincing standard has not been inconsistent with a preponderance of the evidence standard. *In re Garcia,* 88 B.R. 695, 701 (Bankr.E.D.Pa.1988) (citing *In re Locust Building Co., Inc.,* 299 F. 756, 765 (2nd Cir.1924) ("[T]he general rule is that fraud must be made out by a preponderance of evidence, which must be so clear and strong as to preponderate ...")); *see also In re Mayo,* 94 B.R. 315, 323–24, 328 (Bankr.D.Vt.1988).

**8.** *See also Addington v. Texas,* 441 U.S. 418, 424, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (fraud by clear and convincing evidence); *Lalone v. United States,* 164 U.S. 255, 17 S.Ct. 74, 41 L.Ed. 425 (1896) ("[T]he rule is of long standing, and is of universal application, that evidence tending to prove fraud and upon which to found a

verdict or decree, must be clear and satisfactory."); *Farnsworth v. Duffner,* 142 U.S. 43, 48, 12 S.Ct. 164, 165, 35 L.Ed. 931 (1891) ("party seeking rescission of a contract, on the ground of misrepresentations, must establish the same by clear and irrefragable evidence") (*citing Ludington v. Renick,* 7 W.Va. 273 (1874)); *Bank of Pocahontas v. Ferimer,* 161 Va. 37, 40–41, 170 S.E. 591, 592 (1933).

**9.** This holding is consistent with our holding in *In re Cleveland,* (Bankr.E.D.Va.1985) [unpublished opinion A.P. Nos. 84–0018 and 84–0021, 5–15–85] wherein we held that a false oath may be proven by a preponderance of the evidence, but intent to defraud must be proven by clear and convincing evidence. *Id.* at 19, 23.

bank account or of his Swiss bank account. He has no transfer slips or receipts of any of the transfers out of the account, no record of the opening of the account and no record of his relationship with the investor Khalil whom Kim claims has beneficial ownership of the Swiss bank account. Under these facts, the court finds that Kim has failed to maintain records from which his assets and liabilities can be identified with reasonable certainty.

Kim testified that he kept a handwritten record of his dealings with Khalil, including Khalil's instructions, in a notebook. The assertion that a businessman with the experience and education of Kim would keep a spiral notebook as his only record for such significant transactions as transfers of thousands of dollars from his Swiss bank account is not credible. Kim had a duty to keep a record of his financial transactions in a manner appropriate to his business. A sophisticated debtor involved in complex international transactions must keep records which allow third parties to determine the financial condition of the debtor. The Swiss bank statements that Kim ultimately produced after requesting copies from the bank itself do not explain when the account was opened, where transfers from the account were sent or how the account was held in trust for Khalil. The records Kim produced do not provide the Court with a sufficient description of Kim's financial transactions. Therefore, the Court must find that the bank statements alone do not provide an adequate basis from which Kim's financial condition or business transactions may be ascertained. He, therefore, has not adequately shown the Court how much he has been reimbursed for his travel and how much he has received in his payroll account. Nor has he shown the Court whether or not the $200,000 in certificates of deposit were property of Green Hill or were in fact his property.

■ Furthermore, the court finds that Kim has not shown that the failure to keep or preserve the records was justified under all the circumstances. Kim argues that his failure to provide documents is justified because of his incarceration in Libya for six weeks in May and June of 1985. However, this argument ignores the fact that Kim had a duty to maintain and keep records before and after his incarceration while he was president of Green Hill, was a signatory over Green Hill accounts and involved in numerous transactions involving transfers of Green Hill funds to himself and to others. Kim has provided no explanation for his failure to keep documents other than his incarceration. Furthermore, he has provided no proof of any other reason why he could not or did not keep and preserve financial documentation. Under these circumstances, the Court must find that Kim has not proven that his failure to keep or preserve records from which his financial condition can be ascertained is justified, thus eliminating his right to a discharge under section 727(a)(3).

■ Ghariani, the objecting creditor, also alleges section 727(a)(4)(A) as grounds to deny Kim a discharge.[10] As set forth below, we find that Ghariani has sustained his objection on these grounds also.

In order to sustain an objection to discharge under section 727(a)(4), the evidence must establish that the debtor knowingly and fraudulently made a false oath or account in connection with the bankruptcy case. *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir.1987); *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984); *Farmers Co-operative Assoc. v. Strunk*, 671 F.2d 391, 396 (10th Cir.1982). A knowing and fraudulent omission from a sworn Statement of Affairs or schedule may constitute a false oath. *Farmers Co-operative*, 671 F.2d at 395; *In re Mascolo*, 505 F.2d 274, 278 (1st Cir.1974); *Lowe's of Virginia v. Thomas*, 60 B.R. 418, 421 (W.D. Va.1986). The false oath must relate to a material matter; the oath satisfies the materiality requirement if it bears a relation-

---

**10.** Section 727(a)(4)(A) reads as follows:
(a) The court shall grant the debtor a discharge, unless ...
· . . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—
(A) made a false oath or account[.]
11 U.S.C. § 727(a)(4)(A).

ship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. *Williamson*, 828 F.2d at 251; *Chalik*, 748 F.2d at 618; *Johnson*, 82 B.R. at 805. Because debtors are unlikely to acknowledge fraudulent intent, the court may infer such intent from circumstantial evidence. *Williamson*, 828 F.2d at 252; *Mascolo*, 505 F.2d at 276; *Johnson*, 82 B.R. at 805; *see also, In re Topping*, 84 B.R. 840 (Bankr.M.D.Fla.1988) ("intent [to defraud] ... may be based on circumstantial evidence or on inferences drawn from a course of conduct"); *In re Shumate*, 55 B.R. 489 (Bankr.W.D.Va.1985); *In re Nazarian*, 18 B.R. 143, 146 (Bankr.D.Md.1982) (proof of actual intent to defraud may be inferred from the facts).

The Fourth Circuit has ruled in *Williamson v. Fireman's Fund*, that the debtor's failure to include a joint bank account on his Statement of Financial Affairs was a false oath for the purposes of section 727(a)(4). 828 F.2d 249, 251 (4th Cir.1987). The Court rejected the debtor Williamson's statement that he did not include the account because he believed he had no interest in it. *Id.* at n. 2. Specifically, the Court stated:

> Williamson knew that his name was on the joint bank account with Janet Cardwell; he deposited funds into this account and had the right to withdraw funds from it. Under these circumstances, we must conclude that Williamson's failure to disclose the existence of the joint bank account was knowing.

*Williamson*, 828 F.2d at 251, n. 2.

A subsequent amendment of schedules may not expunge the falsity of the original schedules. *In re Johnson*, 82 B.R. 801, 805 (Bankr.E.D.N.C.1988); *In re Cline*, 48 B.R. 581, 585 (Bankr.E.D.Tenn.1985); *In re George*, 9 B.R. 9, 10 (Bankr.S.D.Fla.1981). Where a debtor makes a later disclosure in response to fear of discovery, generally such disclosure is not voluntary and there-

fore may suggest the original omission was made with intent to defraud. *See In re Cararette*, 601 F.2d 648, 652 (2nd Cir.1979) (amended schedule after objecting creditor learned through discovery of an undisclosed transfer "can hardly be viewed as a voluntary correction"); *In re Shebel*, 54 B.R. 199, 204 (Bankr.D.Vt.1985) ("[I]nference that the [fraudulent] intent was lacking is only possible if the later disclosure is voluntary and not in response to the fear of discovery."); *George*, 9 B.R. at 10 (disclosure after creditors' meeting and scheduling of deposition comes too late to negate an intent to deceive).

Turning to the case at hand, we deny the debtor Kim a discharge based on three false oaths made by Kim in connection with his bankruptcy case. Kim made two false oaths in his Statement of Financial Affairs. Kim listed only bank accounts in the United States in his petition and Statement of Financial Affairs. In fact, Kim maintained three bank accounts in Korea and one bank account in Switzerland during the relevant time period. Subsequently, Kim amended his petition, after questioning at the 341 hearing, to show that he was a signatory on all of the above accounts. At the 341 hearing, Kim learned that the objecting creditor was aware of Kim's interest in the Swiss bank account and had begun discovery.[11] On these facts, we cannot find that Kim voluntarily amended his schedules and that his original omission was made without an intent to defraud. Kim knew that his name was on each of the accounts and knew that he must sign in order to withdraw money from the accounts. He personally withdrew and transferred funds from at least the Swiss bank account. We conclude on these facts that Kim's omission of his bank accounts from his schedules was intentional. Kim's explanation that he failed to include the Korean bank accounts in his bankruptcy schedules because he did not have the money at the time of filing the petition is insufficient.

---

**11.** Kim misrepresented the character of the account to his attorney when his attorney was preparing Kim's schedules. After learning that Kim was a signatory on the Swiss bank account, the attorney amended the schedules. This fact does not change our finding that Kim knowingly omitted the Swiss bank account and the Korean accounts from his schedules.

Furthermore, Kim failed to disclose on his schedules his receipt of the inheritance from his father. Kim never amended his petition to show the existence of the inheritance. Lastly, Kim denied in his petition that he held property for any other person. During his testimony, Kim repeatedly stated that he held money in the three Korean bank accounts for Green Hill Corporation and that he held the money in the Swiss bank account for Faisal Khalil. Thus, Kim has either made a false oath in his petition or during the trial. On the basis of his repeated false statements and omissions, we infer a fraudulent intent. We have no recourse but to deny Kim a discharge for knowingly and fraudulently making three false oaths in connection with his case. Accordingly, the objection to discharge on the grounds of section 727(a)(4) is hereby granted.

■ Finally, Ghariani asserts as his third grounds for denial of Kim's discharge section 727(a)(5), claiming that Kim has failed to explain satisfactorily his loss of assets.[12] Bankruptcy Rule 4005 imposes upon the plaintiff the burden of proving its objection, but once the plaintiff makes out a prima facie case, the burden of going forward with evidence that will "explain satisfactorily" the losses or deficiencies shifts to the debtor. *Chalik*, 748 F.2d at 619; *Matter of Reed*, 700 F.2d 986, 992 (5th Cir.1983); *Lowe's of Virginia, Inc.*, 60 B.R. at 422; *In re Belk*, 44 B.R. 793, 794 (Bankr. S.D.Fla.1984). Vague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory. *Chalik*, 748 F.2d at 619 (citing, *Reed*, 700 F.2d at 993); *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir.1966); *In re Yokley*, 61 B.R. 198 (Bankr.W.D.Ky.1986) (debtor had unexplained withdrawals from his bank account); *see also In re Roberts*, 81 B.R. 354, 381–82 (Bankr.W.D.Pa.1987) (where debtor gave "specious, off-the-cuff explanations"

for the diminution of pension plan assets, but provided no supporting evidence, discharge denied pursuant to § 727(a)(5)).

Ghariani has shown that Kim received at least $350,000 to $500,000 in 1984 from his father's estate. Furthermore, Ghariani has shown that Kim controlled at least $1,162,185 in a Swiss bank account in his name and had at least $600,000 to $700,000 in bank accounts in Korea, allegedly held for Green Hill. Also, Ghariani established by the evidence that Kim received the benefit of $580,000 in a letter of credit for his own personal business. Kim no longer has the funds he received as part of his inheritance nor any records or explanation for its disappearance. He testified that he transferred the money from Korea to the United States in suitcases and deposited it in bank accounts. Yet, he swore in his petition that the American bank accounts have been closed. Kim has not explained the loss of his inheritance.

Neither has Kim explained the loss of the money in the Swiss bank account. Kim testified at trial that the account had approximately $135,000 as its balance. He swore in his schedules that he did not know the balance of the account but knew that it exceeded $20,000. Kim could not trace the activity in and out of the Swiss bank account and therefore could not explain the tremendous loss of funds out of that account. Likewise, Kim could not explain the diminution of the Korean bank accounts.

Finally, Kim explained the loss of the $580,000 of funds transferred to his personal company as due to start up and overhead expenses. This explanation is not plausible. His company showed a profit of $640,688.28 for the period prior to its receipt of the $580,000 transfer. However, by the end of the calendar year following the transfer, Kim's personal company showed liabilities in excess of its assets by $835,472. Kim has not adequately ex-

---

**12.** Section 727(a)(5) states:
(a) The Court shall grant the debtor a discharge, unless ...

....

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]
11 U.S.C. § 727(a)(5).

plained the loss of the funds transferred to his personal company.

Kim has failed to satisfactorily explain the loss of the inheritance, funds in the Swiss bank account and Korean bank accounts, and money given to his personal company. On these facts, we must deny Charles Kim a discharge under section 727(a)(5).

■ Turning to Mrs. Kim, we find that the objecting creditor in this case, Ghariani, has failed to establish that Mrs. Kim was involved in any of the financial transactions with the Swiss bank, with Khalil, with Green Hill or with Ghariani. In addition, Ghariani has not made any showing that Mrs. Kim was involved in her husband's business. Further, there has been no showing that Mrs. Kim had a duty to maintain books and records, nor has there been any showing that Mrs. Kim's discharge should be denied under any of the other grounds asserted. Accordingly, the objection to Mrs. Kim's discharge is denied. *See In re Hyers,* 70 B.R. 764, 769 (Bankr.M.D. Fla.1987) (wife granted discharge where nothing in record suggested she had anything to do with transactions between husband and plaintiff and no proof presented of a duty to maintain records); *In re Reitz,* 69 B.R. at 195 (wife not directly connected with the business and transactions of husband, signed documents husband requested, granted discharge).

Pursuant to the foregoing, Charles C. Kim is hereby denied a discharge as provided by section 727(a)(3), section 727(a)(4) and section 727(a)(5). Duak F. Kim, however, will be granted a discharge. Having denied the debtor Kim's discharge on the above grounds, we need not address the objections raised under section 523(a)(6) or section 523(a)(2)(A).

An appropriate Order will enter.